# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 5, 2018   Decided August 30, 2019

No. 16-1052

ALON REFINING KROTZ SPRINGS, INC.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

MONROE ENERGY, LLC, ET AL.,
INTERVENORS

———

Consolidated with 16-1055, 17-1255, 17-1259, 18-1021,
18-1024, 18-1025, 18-1029

———

On Petitions for Review of Agency Action of the
United States Environmental Protection Agency

———

*Samara L. Kline* argued the cause for petitioners. With her on the briefs were *Evan A. Young*, *Megan H. Berge*, *Lisa M. Jaeger*, *Brittany M. Pemberton*, *Clara Poffenberger*, *Richard S. Moskowitz*, *Robert J. Meyers*, *Thomas A. Lorenzen*, *Elizabeth B. Dawson*, *Warren R. Neufeld*, *LeAnn M. Johnson*, and *Jonathan G. Hardin*. *Albert M. Ferlo Jr.* and *Krista Hughes* entered appearances.

*Meghan E. Greenfield*, Trial Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *Jeffrey H. Wood*, Acting Assistant Attorney General. *Daniel R. Dertke*, Attorney, entered an appearance.

*Robert A. Long Jr.* argued the cause for intervenors American Petroleum Institute and Growth Energy. With him on the brief were *Kevin King*, *Seth P. Waxman*, *David M. Lehn*, *Saurabh Sanghvi*, and *Claire Chung*. *Stacy R. Linden* entered an appearance.

*Shannen W. Coffin* and *Linda C. Bailey* were on the brief for *amici curiae* NACS, et al. in support of respondent EPA.

3
___

No. 17-1044

COFFEYVILLE RESOURCES REFINING & MARKETING, LLC AND
WYNNEWOOD REFINING COMPANY, LLC,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

ALON REFINING KROTZ SPRINGS, INC., ET AL.,
INTERVENORS

___

Consolidated with 17-1045, 17-1047, 17-1049, 17-1051,
17-1052

___

On Petitions for Review of Action of the
United States Environmental Protection Agency

___

*Brian Killian* argued the cause for petitioner The National Biodiesel Board. With him on the briefs was *Douglas A. Hastings*.

*Samara L. Kline* and *Thomas Allen Lorenzen*, argued the causes for Obligated Party Petitioners. With them on the briefs were *Evan A. Young*, *Lisa M. Jaeger*, *Brittany M. Pemberton*, *Clara Poffenberger*, *Richard S. Moskowtiz*, *Robert J. Meyers*, *Elizabeth B. Dawson*, *David W. DeBruin*, *Thomas J. Perrelli*, *Matthew E. Price*, *LeAnn M. Johnson*, and *Jonathan G.*

*Hardin*. *David Y. Chung*, *Eric D. Miller*, and *Albert M. Ferlo Jr.* entered appearances.

*Patrick R. Jacobi* and *Samara M. Spence*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief was *Jeffrey H. Wood*, Acting Assistant Attorney General.

*Thomas Allen Lorenzen* argued the cause for intervenors American Fuel & Petrochemical Manufacturers and American Petroleum Institute in support of respondent regarding Biomass-Based Diesel Issues. With him on the brief were *Robert J. Meyers*, *Elizabeth B. Dawson*, *Richard S. Moskowitz*, *Robert A. Long*, *Jr.*, and *Kevin King*. *Stacy R. Linden* entered an appearance.

*Robert A. Long, Jr.*, *Kevin King*, *Bryan M. Killian*, *Douglas A. Hastings*, *Seth P. Waxman*, *David M. Lehn*, *Saurabh Sanghvi*, and *Claire H. Chung* were on the brief for intervenors Growth Energy, et al. in support of respondent. *Eric D. Miller* entered an appearance.

Before: PILLARD and KATSAS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

## TABLE OF CONTENTS

I.    Introduction.................................................................. 6

II.   Background .................................................................. 7

5

    A.   Legal Background.......................................................... 7

    B.   Procedural Background ............................................ 12

        1.   2007, 2010, and 2017 Point of Obligation Proceedings ......................................................... 12

        2.   2017 Annual Volumetric Proceedings ................... 15

III.    Standard of Review ................................................... 17

IV.    2010 Point of Obligation Rule ................................. 17

    A.   Jurisdiction................................................................ 17

        1.   Final Agency Action Under Section 7607(b)(1).... 19

        2.   After-Arising Grounds Under Section 7607(b)(1) ............................................................ 28

        3.   Mandatory Reconsideration Under Section 7607(d)(7)(B)....................................................... 29

    B.   Merits of Challenges to EPA's Refusal to Revise the 2010 Point of Obligation Rule ............................ 32

V.    2017 Annual Volumetric Rule ................................... 41

    A.   Point of Obligation ................................................... 42

        1.   Jurisdiction.......................................................... 42

        2.   Merits ................................................................. 43

    B.   Cellulosic Biofuel Projection.................................... 53

    C.   Cellulosic Waiver ..................................................... 58

VI.    2018 Volume for Biomass-Based Diesel ................... 62

    A.   NBB's Standing........................................................ 63

    B.   Merits of NBB's Challenges..................................... 65

VII.    Conclusion ................................................................ 70

*PER CURIAM*:

## I.    Introduction

The Clean Air Act requires EPA to publish "renewable fuel standards," ultimately expressed as "applicable percentages," each year to ensure that the total supply of transportation fuel sold or imported into the United States contains specified proportions of each of four categories of renewable fuels.  Congress intended the Renewable Fuel Standards (RFS) program to "move the United States toward greater energy independence and security" and "increase the production of clean renewable fuels." *See* Energy Independence and Security Act of 2007 (EISA), Pub. L. No. 110-140, preamble, 121 Stat. 1492 (2007) (codified at 42 U.S.C. § 7545(*o*)).

In these related cases, Alon Refining Krotz Springs, together with other petroleum refineries and their trade associations—the "Alon Petitioners"—seek review of EPA's decision not to revise its 2010 point of obligation regulation requiring refineries and importers, but not blenders, to bear the direct compliance obligation of ensuring that transportation fuels sold or introduced into the U.S. market include the requisite percentages of renewables.  Coffeyville Resources Refining & Marketing and another group of refineries and trade associations—the "Coffeyville Petitioners"—challenge EPA's refusal to reassess the appropriateness of the point of obligation in the context of its 2017 annual volumetric rule, which set the 2017 applicable percentages for all four categories of renewable fuel and the 2018 applicable volume for one subset of such fuel, biomass-based diesel. *See* 81 Fed. Reg. 89,746 (Dec. 12, 2016) (2017 Rule).  The Coffeyville Petitioners also contend that EPA arbitrarily set the 2017 percentage standards

too high. The National Biodiesel Board (NBB)—a biomass-based diesel industry trade association—separately contends that EPA set the 2018 applicable volume for biomass-based diesel too low. Various trade associations representing refineries and producers of renewable fuels have intervened in support of EPA. For the reasons that follow, we deny each of the petitions for review, many of which recycle arguments raised and rejected in prior challenges.

## II.  Background

### A.  Legal Background

Congress established the RFS program in 2005 as part of the Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594 (2005) (as amended at 42 U.S.C. § 7545(*o*)). The statute mandates the gradual introduction of four nested categories of renewable fuels into the United States' supply of gasoline, diesel, and other transportation fuels. *See* 42 U.S.C. § 7545(*o*)(2)(B). These categories include: (1) total renewable fuel; (2) advanced biofuel; (3) cellulosic biofuel; and (4) biomass-based diesel. *Id.* § 7545(*o*)(2)(A)(i), (B). The umbrella category, total renewable fuel, covers the three other categories plus any conventional renewable fuels, such as corn-based ethanol. *See id.* § 7545(*o*)(1)(F), (J), (2)(A)(i). The advanced biofuel subset includes any renewable fuel (except ethanol from cornstarch) that has at least 50% lower lifecycle greenhouse gas emissions than fossil fuels. *Id.* § 7545(*o*)(1)(B). The statute further specifies two nonexclusive subsets of advanced biofuels: cellulosic biofuel (a renewable fuel derived from cellulose materials such as corn stalks and husks) and biomass-based diesel (a diesel fuel substitute made from feedstocks such as animal fats). *Id.* § 7545(*o*)(1)(B), (D), (E); EPA Coffeyville Br. 4–5. The

following figure depicts the nested nature of the four fuel categories.



Source: Coffeyville Br. 11.

Four tables in the statute set forth gradually increasing annual "applicable volume" requirements for each category of renewable fuel. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i). The statute sets applicable volumes for biomass-based diesel through 2012, *id*. § 7545(*o*)(2)(B)(i)(IV), and applicable volumes for the other three categories through 2022, *id.* § 7545(*o*)(2)(B)(i)(I)–(III). Under those tables, as the total quantities of renewable fuel rise over time, the ratio of advanced biofuels relative to conventional renewable fuel gradually increases. *Id.* For compliance years (which match calendar years) after those specified in the tables, the statute requires EPA, in coordination with the Secretaries of Energy and Agriculture, to set the annual applicable volumes based on

a review of the implementation of the program plus an analysis of six listed factors. *Id.* § 7545(*o*)(2)(B)(ii). For years not specified in the table, EPA must publish the applicable volumes fourteen months before the year in which they will apply— volumes that, shortly before the start of the compliance year, EPA translates into percentage standards. *Id.*

Various "waiver" provisions require or permit EPA to lower the annual applicable volumes. Two are relevant for the purposes of this case. First, under the "cellulosic waiver provision," EPA must make its own projection of the volume of cellulosic biofuel that will be produced in the following year. *Id.* § 7545(*o*)(7)(D)(i). If that projection is less than the statutory figure, the agency must use its own projection as the applicable volume of cellulosic biofuel. *Id.*; *see Am. Petroleum Inst. v. EPA*, 706 F.3d 474, 477–80 (D.C. Cir. 2013) (*API*). The same cellulosic waiver provision authorizes (but does not require) EPA to also reduce the advanced biofuel and total renewable biofuel volume requirements "by the same or a lesser volume" as the cellulosic biofuel reduction, 42 U.S.C. § 7545(*o*)(7)(D)(i), and EPA has "broad discretion" regarding whether and how to do that, *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014). Separately, under the "general waiver provision," EPA may reduce any of the statutory applicable volumes if it determines "that implementation . . . would severely harm the economy or environment," or "that there is an inadequate domestic supply." 42 U.S.C. § 7545(*o*)(7)(A); *see Ams. for Clean Energy v. EPA*, 864 F.3d 691, 707–13 (D.C. Cir. 2017) (*ACE*).

After EPA determines the waiver-adjusted applicable volumes, it must translate those volumes into "renewable volume obligation[s]" for each category of renewable fuel for the upcoming compliance year. 42 U.S.C. § 7545(*o*)(3)(B)(i). The volume obligation for each category of renewable fuel is expressed as an "applicable percentage," also known as a

"percentage standard," calculated by dividing the adjusted applicable volume for that category of fuel by the total anticipated volume of non-renewable transportation fuel that will be introduced into commerce (which EPA derives based on an estimate provided by the Energy Information Administration) in the coming compliance year. *Id.* § 7545(*o*)(3)(A), (B)(ii)(II); 40 C.F.R. § 80.1405(c). The statute calls on EPA to publish the percentage standards not later than November 30—a month before the start of the compliance year. 42 U.S.C. § 7545(*o*)(3)(B)(i).

EPA must place the renewable volume obligations on "refineries, blenders, and importers, as appropriate." 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I); *see also id.* § 7545(*o*)(2)(A) (requiring EPA to promulgate implementing regulations, including "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate," designed to ensure that transportation fuel sold or introduced into the United States "contains at least" the required annual applicable volumes). The entities that EPA designates to meet the volume obligations are known as "obligated parties." *Monroe Energy*, 750 F.3d at 912. Each obligated party must ensure that the volume of non-renewable fuel it sells or introduces into U.S. commerce is matched by selling or introducing a corresponding volume of each category of renewable fuel at the level EPA's percentage standard requires for that category. *See ACE*, 864 F.3d at 699. The percentage standards are set in the anticipation that, if each obligated party meets them and EPA's projection regarding the country's total transportation fuel supply bears out, the amount of each category of renewable fuel introduced into the economy in the upcoming compliance year will equal the applicable volumes for that year. *Id.* Obligated parties bear no direct responsibility for any shortfalls in the applicable volumes so long as they comply with the percentage standards.

11

EPA assigns a set of "renewable identification numbers" (RINs) to each batch of renewable fuel that is produced or imported for use in the United States. 40 C.F.R. § 80.1426; *see* 42 U.S.C. § 7545(*o*)(5); *Monroe Energy*, 750 F.3d at 913. The number of RINs assigned to each batch corresponds to the amount of ethanol-equivalent energy per gallon in that batch. *See* 40 C.F.R. § 80.1415; *Monroe Energy*, 750 F.3d at 913. RINs remain attached to the renewable fuel until that fuel is purchased by an obligated party or blended into fossil fuels to be used for transportation fuel. *See ACE*, 864 F.3d at 699 (citing 40 C.F.R. § 80.1429(b)(1)–(2)). At that point the RINs become "separated," meaning they are, in effect, a form of compliance credit. *Id.* Obligated parties demonstrate their compliance with their renewable fuel obligations by "retiring" RINs in annual compliance demonstrations to EPA. 40 C.F.R. §§ 80.1427(a), 80.1451(a)(1).

Because the four categories of renewable fuel are nested, obligated parties can comply with their obligations for a type of fuel by retiring any combination of RINs corresponding to that category of fuels or any subset thereof. *See* 40 C.F.R. § 80.1427(a)(3)(i). For instance, retiring a cellulosic biofuel or biomass-based diesel RIN counts not only toward the volume obligation for that fuel, but also toward both the advanced biofuel and total renewable fuel obligations. Thus, "if one million gallons of cellulosic biofuel are blended into the fuel supply, the statute allows those one million gallons to be credited toward the advanced biofuel and total renewable fuel obligations in addition to the cellulosic biofuel obligation." *ACE*, 864 F.3d at 698.

Obligated parties who have more RINs than they need may sell or trade their excess, 40 C.F.R. § 80.1428(b), or they may "bank" those RINs for use to meet up to 20 percent of their obligations for the following compliance year, *Monroe Energy*, 750 F.3d at 913; *see* 40 C.F.R. § 80.1427(a)(1), (5); Regulation

of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670, 14,734–35 (Mar. 26, 2010). Obligated parties without enough RINs to meet their compliance obligations may purchase RINs, use banked RINs from the prior year, or carry a deficit forward to the following year to be satisfied together with the following year's obligations. *See ACE*, 864 F.3d at 699–700; *see also* 42 U.S.C. § 7545(*o*)(5)(D); 40 C.F.R. § 80.1427(b).

## B. Procedural Background

The procedural history of these cases follows two paths: first, the proceedings relevant to the challenge that EPA arbitrarily declined to initiate a rulemaking to modify the 2010 regulation designating refineries and importers, but not blenders, as obligated parties; and second, the proceedings challenging the 2017 Rule.

### 1. 2007, 2010, and 2017 Point of Obligation Proceedings

In its 2007 regulations implementing the RFS program, EPA designated refiners and importers, but not blenders, as the "appropriate" parties to meet the renewable fuel obligation. 72 Fed. Reg. 23,900, 23,923–24 (May 1, 2007). At the time, those designations were not challenged in court. EPA reaffirmed its designations in a 2010 regulation now commonly known as the "point of obligation rule." 75 Fed. Reg. at 14,721–22 (codified at 40 C.F.R. § 80.1406(a)(1)). During the 2010 rulemaking, several refiners—including petitioner Valero Energy Corporation—argued that failing to obligate blenders, who combine renewable fuel with fossil fuels, would make the RFS program unworkable. EPA concluded that the program was functioning adequately and that the burdens and disruption from changing the point of obligation would outweigh any

benefits. *See* Summary and Analysis of Comments 3.9.2, Alon J.A. 287–90. Although other aspects of the 2010 regulations were challenged in court, *see, e.g.*, *Nat'l Chicken Council v. EPA*, 687 F.3d 393 (D.C. Cir. 2012); *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145 (D.C. Cir. 2010), the point of obligation rule was not.

On December 14, 2015, EPA promulgated the volume requirements for 2014, 2015, and 2016. Renewable Fuel Standard Program, 80 Fed. Reg. 77,420 (Dec. 14, 2015). In so doing, EPA exercised its general waiver authority to lower the total renewable fuel volumes based on a finding of inadequate domestic supply due to market factors "affecting the ability to distribute, blend, dispense, and consume . . . renewable fuels" at the levels required by statute. *Id.* at 77,435/2. Among those factors was "the slower than expected development of the cellulosic biofuel industry." *Id.* at 77,422. The agency thought an additional "real world constraint[]" was the "E10 blendwall"—the difficulty for most American vehicle engines to run on blends containing more than 10% ethanol. *Id.* at 77,423. EPA explained that those factors made the statutory requirements "impossible to achieve." *Id.* at 77,422/2. This Court later vacated the general waiver on the ground that EPA had misinterpreted the statutory term "inadequate domestic supply" to include demand-side constraints such as the E10 blendwall. *See ACE*, 864 F.3d at 704–13.

On February 12, 2016, sixty days after EPA promulgated the volume requirements for 2014–16, the Alon Petitioners petitioned this Court for review of the 2010 point of obligation rule. These petitions contend that the rule was arbitrary and capricious insofar as it failed to impose the obligation on downstream blenders—the parties petitioners think are best able to comply with it. The petitions assert jurisdiction under the after-arising provision in 42 U.S.C. § 7607(b)(1), which

permits otherwise-untimely challenges to a rule if the challenges are "based solely on grounds arising after" the sixty-day deadline for seeking judicial review. The petitioners assert that EPA's exercise of its general waiver authority in the 2014–16 volume regulations, and its acknowledgment of the RFS program's shortcomings as of that time, provided such an after-arising ground.

The Alon Petitioners simultaneously petitioned EPA to revise the point of obligation rule. Some of their requests were styled as petitions for a rulemaking. Others were styled as petitions for mandatory reconsideration under 42 U.S.C. § 7607(d)(7)(B), which requires EPA to reconsider a rule if centrally important objections were impracticable to raise during the comment period or "arose after" that period "but within the time specified for judicial review." The petitions cited the waiver in the 2014–16 volume regulations and EPA's acknowledgment of program difficulties as grounds supporting mandatory reconsideration. This Court held in abeyance the petitions for review of the point of obligation rule pending resolution of the petitions to revise it.

On November 10, 2016, EPA published a proposed denial of the petitions to revise the point of obligation rule. On November 22, 2017, after reviewing more than 18,000 comments on the proposal, EPA denied the petitions. It concluded that the statutory requirements for mandatory reconsideration were not met, so it treated all the filings as petitions for a rulemaking. Denial of Petitions for Rulemaking to Change the RFS Point of Obligation, EPA-HQ-OAR-2016-0544-0525, at 7 (Nov. 22, 2017) (EPA Denial), Alon J.A. 61. EPA then denied the petitions on the ground that "changing the point of obligation would . . . likely result in a decrease in the production, distribution, and use of [renewable] fuels" and would "do nothing to incentivize the research, development,

and commercialization of cellulosic biofuel technologies critical for the growth of the RFS program in future years." EPA Denial at 8–9, Alon J.A. 62–63.

Within sixty days (in December 2017 and January 2018), the Alon Petitioners sought judicial review of that denial, which it cast as a final agency action under section 7607(b)(1). The two sets of petitions—the February 2016 petitions for review of the 2010 point of obligation rule and the 2017–18 petitions for review of EPA's refusal to reconsider the rule— were consolidated and are now before us.

### 2. 2017 Annual Volumetric Proceedings

EPA issued its 2017 annual volumetric rule on December 12, 2016. The 2017 Rule establishes: (1) the applicable volume for biomass-based diesel for 2018, 81 Fed. Reg. at 89,751/2; (2) the waiver-adjusted applicable volumes for cellulosic biofuel, advanced biofuel, and total renewable fuel for 2017, *id.* at 89,747 tbl. I-1; and (3) percentage standards for all four fuel types for 2017, *id.* at 89,751, tbl. I.B.6-1.

EPA exercised its mandatory cellulosic waiver authority to decrease the 2017 applicable volume for cellulosic biofuel by more than 94 percent, dropping 5.189 billion gallons from the statutory target of 5.5 billion gallons, to 311 million gallons. *Id.* at 89,750/2; 42 U.S.C. § 7545(*o*)(2)(B)(i)(III). EPA then had discretion under that same waiver authority to cut as much as 5.189 billion gallons off the statutory volumes for advanced biofuel and total renewable fuel. *See* 42 U.S.C. § 7545(*o*)(7)(D)(i); 81 Fed. Reg. at 89,762 & tbl. IV.A-1. EPA partially exercised that authority, reducing the 9-billion-gallon statutory target for advanced biofuel by 4.72 billion gallons, resulting in an adjusted applicable volume of 4.28 billion gallons—a greater than 50% decrease. 81 Fed. Reg. at 89,750–51; 42 U.S.C. § 7545(*o*)(2)(B)(i)(II). EPA reduced the total

renewable fuel volume requirements by the same amount, lowering the statutory target of 24 billion gallons to 19.28 billion gallons. 81 Fed. Reg. at 89,751/1; 42 U.S.C. § 7545(*o*)(2)(B)(i)(I). EPA considered but decided against also using its general waiver authority to further lower the applicable volume of total renewable fuel. 81 Fed. Reg. at 89,751/1.

Using the waiver-adjusted applicable volumes, EPA set the 2017 percentage standards for each of the four renewable fuel categories. *See id.* at 89,751, 89,799–801. Finally, EPA set the biomass-based diesel applicable volume for 2018 at 2.1 billion gallons. *Id.* at 89,751/2. EPA received comments urging it to reassess the point of obligation in the 2017 Rule, but declined to address them on the grounds that the comments were "beyond the scope" of the 2017 rulemaking. Response to Comments at 542, Coffeyville J.A. 761.

After EPA published the 2017 Rule, various parties petitioned for judicial review. The Coffeyville Petitioners contend that EPA erred by refusing to reconsider which types of parties would bear the direct compliance obligation under the 2017 Rule. They also argue that EPA arbitrarily calculated the 2017 production of cellulosic biofuel and arbitrarily exercised its discretionary cellulosic waiver authority, resulting in percentage standards that are too high. NBB argues that EPA set the 2018 applicable volume for biomass-based diesel too low by considering factors it should not have and omitting or incorrectly assessing others. Two trade associations representing refineries have intervened in defense of EPA's biomass-based diesel decision, and a coalition of trade associations representing renewable fuel producers and refineries have intervened to oppose the Coffeyville

Petitioners' claims. None of the petitioners' challenges succeeds.

## III.    Standard of Review

"This court applies the familiar, deferential standard announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, to sustain any reasonable agency interpretation of ambiguity in the Clean Air Act." *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 7 (D.C. Cir. 2015). "We employ the deferential *State Farm* standard of review when reviewing arguments based on allegedly arbitrary or unreasoned agency action." *ACE*, 864 F.3d at 726 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under that rubric, EPA's actions are "presumptively valid provided [they] meet[] a minimum rationality standard." *Nat. Res. Def. Council, Inc. v. EPA*, 194 F.3d 130, 136 (D.C. Cir. 1999). We uphold EPA's actions so long as they are "reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

## IV.    2010 Point of Obligation Rule

We start with the Alon Petitioners and their challenges to the 2010 point of obligation rule.

## A.  Jurisdiction

We begin, as we must, with our jurisdiction. In general terms, the question presented involves our review of rules promulgated under the Clean Air Act, or EPA's failure to amend them, after the initial window for seeking judicial

review has passed. Various statutory provisions frame this inquiry.

Section 7607(b)(1) of Title 42 provides for judicial review of regulations promulgated by the Administrator of EPA under the Clean Air Act. The first sentence of section 7607(b)(1) vests this Court with exclusive jurisdiction to review "nationally applicable regulations promulgated, or final action taken, by the Administrator" under the Act. The fourth sentence of section 7607(b)(1) specifies the time for seeking judicial review. It imposes a sixty-day time limit, but provides an exception for petitions based on grounds arising after the limit: "Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise."

Section 7607(d) of Title 42 sets forth provisions for various rulemakings under the Clean Air Act, including for the "promulgation or revision of any regulation" involving the RFS program. *Id.* § 7607(d)(1)(E). Section 7607(d)(7)(B) addresses various issues regarding exhaustion, agency reconsideration, and judicial review. The first sentence of that provision imposes a conventional exhaustion requirement, limiting judicial review to objections "raised with reasonable specificity during the period for public comment." The second sentence requires EPA to reconsider regulations in certain narrow circumstances: "If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is

of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was promulgated." The third sentence of section 7607(d)(7)(B) makes any "refusal" to provide such mandatory reconsideration judicially reviewable.

At various times in this litigation, the petitioners have asserted three different jurisdictional theories. First, EPA's refusal to revise the point of obligation rule in 2017 was a final action reviewable under the first sentence of section 7607(b)(1), regardless of the after-arising provision. Second, EPA's statements and actions in its 2014–16 volume regulation constitute after-arising grounds permitting a challenge to the point of obligation rule as promulgated in 2010. Third, these same EPA statements and actions triggered a right to mandatory reconsideration under section 7607(d)(7)(B), which in turn makes the denial of reconsideration judicially reviewable. As explained below, we conclude that the first contention is correct, the second has been abandoned, and the third lacks merit.

### 1. Final Agency Action Under Section 7607(b)(1)

In 2016, various refiners petitioned EPA for a rulemaking to modify the point of obligation rule. The petitions urged that the need for a modification became evident in 2015, when EPA waived certain statutory volume requirements and concluded that changing economic conditions had made the requirements "impossible to achieve." 2014–16 Rule, 80 Fed. Reg. at 77,422/2. In November 2017, EPA denied the rulemaking petitions on the ground that any current problems with the RFS program were manageable and that changing the point of obligation at this juncture would be disruptive. EPA Denial at

8–9, Alon J.A. 62–63. The refiners sought review of the denial in December 2017 and January 2018. As petitioners in this Court, they contend that the November 2017 denial constituted final agency action reviewable under section 7607(b)(1). We agree.

As noted above, the first sentence of section 7607(b)(1) gives this Court exclusive jurisdiction to review any nationally applicable "final action" taken by EPA under the Clean Air Act. The parties agree that the denial of the rulemaking petitions was nationally applicable, final, and taken under the Clean Air Act. It was also agency "action" within the meaning of the statute. That word "bears the same meaning in [section 7607(b)(1)] that it does under the Administrative Procedure Act," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001), which defines "agency" to include EPA, 5 U.S.C. § 551(1), and "agency action" to include "the whole or a part of an agency *rule*, order, license, sanction, relief, or the equivalent *or denial* thereof, or failure to act," *id.* § 551(13) (emphases added). So, EPA's denial of the petitions for rulemaking was a reviewable "action."

The petitions for review were timely. As a general matter, section 7607(b)(1) requires a petition for review to be filed within sixty days of when "notice of such promulgation, approval, or action appears in the Federal Register." Here, the "action" at issue—denial of the petitions for rulemaking—was published in the Federal Register on November 22, 2017, and the petitions for review of that action were filed within sixty days of that date. Moreover, this conclusion does not depend on the after-arising provision. To the contrary, because the petitions for review were filed *within* sixty days of the "action" under review, the exception for "grounds arising after such sixtieth day" was not triggered.

Our caselaw confirms this framing of the jurisdictional issue. In *Massachusetts v. EPA*, 415 F.3d 50 (D.C. Cir. 2005), this Court held that EPA's denial of a petition to regulate greenhouse gas emissions as air pollutants was itself "final action" reviewable under section 7607(b)(1). *See id.* at 53–54 (opinion of Randolph, J.); *id.* at 61 (Sentelle, J., concurring in the judgment). The Supreme Court reversed our judgment on the merits, but agreed that we had jurisdiction. *Massachusetts v. EPA*, 549 U.S. 497 (2007). In particular, the Court noted that section 7607(b)(1) "expressly permits review" of EPA's "rejection of [a] rulemaking petition." *Id.* at 520, 528; *see also id.* at 517 (section 7607(b)(1) affords "the right to challenge [this] agency action unlawfully withheld"). Likewise, in *Natural Resources Defense Council v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) (en banc) (*NRDC*), we held that a 1985 decision to withdraw proposed amendments to certain 1976 regulations—which we described as a "decision not to amend" the regulations—was "reviewable agency action" under section 7607(b)(1). *Id.* at 1150 (quotation marks omitted). We concluded that the petition for review at issue, which on its face challenged the 1985 withdrawal decision, was not, in substance, an untimely "'back-door' challenge to the 1976 regulations." *Id.* On that point, we reasoned that the petitioners claimed legal errors in the 1985 withdrawal and sought vacatur only of that order. Likewise, in this case, the petitions for review filed in 2017 and 2018 raise no back-door challenge to the 2010 regulation: the petitions contend that EPA in 2017 arbitrarily refused to take account of changing economic conditions, and they seek vacatur only of the 2017 order denying a new rulemaking going forward.

Background principles of administrative law reinforce our conclusion that the denial of a petition to modify a rule based on changed circumstances is itself a reviewable order. Ordinarily, the denial of a petition to amend or rescind a

regulation is judicially reviewable.  *See, e.g.*, *NLRB Union v. FLRA*, 834 F.2d 191, 195–96 (D.C. Cir. 1987).  When the petition to amend attacks defects in the regulation as originally promulgated, and when the time limit for seeking review of the regulation has passed, questions can arise about whether the time limit is being improperly circumvented.  In these circumstances, we have held that the petitioner cannot raise procedural challenges to the regulation, but can raise substantive arguments that the regulation is unauthorized by or conflicts with a statute.  *See id.* at 196–97.  But the circumvention concern does not even arise when the petitioner raises arguments about changed circumstances or new information.  Those kinds of arguments—that recent developments compel the amendment of an older regulation—are always cognizable through review of the denial of a petition to amend, though they trigger an "extremely limited" review on the merits.  *Id.* at 196.  Our decision today harmonizes the judicial-review provisions of the Clean Air Act with this general background principle.

EPA recognizes the general rule that, under the *NLRB Union* line of cases, the denial of a petition to amend a rule is a reviewable order, which supports *both* challenges based on recent developments *and* substantive challenges to the original regulation.  Nonetheless, EPA urges a different rule where the applicable judicial-review provision contains a time limit for seeking review and an exception for grounds arising after the time limit, as in the Clean Air Act.  In those circumstances, according to EPA, a challenge to the denial of a petition to amend is untimely—and the denial is thus entirely unreviewable—unless the after-arising provision is satisfied.  EPA rests this conclusion on *National Mining Ass'n v. Department of Interior*, 70 F.3d 1345 (D.C. Cir. 1995), and *American Road & Transportation Builders Ass'n v. EPA*, 588

F.3d 1109 (D.C. Cir. 2009) (*ARTBA*), but neither decision supports its position.

*National Mining* involved judicial review under the Surface Mining Control and Reclamation Act (SMCRA), which requires petitions for review to be filed "within sixty days" of the agency action at issue "or after such date if the petition is based solely on grounds arising after the sixtieth day." *See* 70 F.3d at 1350. In 1986, parties petitioned the Department of Interior to rescind a 1979 SMCRA regulation on two grounds. First, the petitioners argued that the rule was inconsistent with the statute—an argument attacking the regulation itself and "available" when the regulation was originally promulgated. *See id.* After the agency declined to rescind the rule, the challengers sought judicial review. We held that the after-arising provision made this first challenge untimely, by explicitly requiring challenges to a regulation either to be filed "within the statutory period" or to "meet the after-arising test." *Id.* at 1350–51. At the same time, however, we held that the petitioners' second challenge—to the agency's 1986 decision refusing to "*repeal*" the regulation based on changed circumstances—*was* timely and reviewable. *Id.* at 1352. To be sure, we described the latter challenge as resting on "grounds that arose after the sixtieth day." *Id.* But we failed to explain what jurisdictional theory that observation supported: a challenge to the 1979 regulation rendered timely by the after-arising exception; or a challenge, in substance as well as form, to the 1986 refusal to repeal, akin to the challenge that we held reviewable in *NRDC*. Instead, we simply concluded that, under the "limited scope of our review," the agency did not "act[] unreasonably in denying the petition for rulemaking." *Id.* at 1352–53. Thus, while *National Mining* blessed jurisdiction to review agency refusals to amend regulations based on changed factual circumstances, it did not

ultimately address what we clarify today—the precise statutory basis for that jurisdiction.

*ARTBA* applied the reasoning of *National Mining* to the Clean Air Act, which also contains a time limit for judicial review and an exception for after-arising grounds. *ARTBA* involved a 2002 petition to amend 1997 regulations on the ground that they allowed states "to adopt precisely the kinds of regulations that the statute forbids." 588 F.3d at 1110. As in *National Mining*, the challenge was thus a substantive attack on a regulation as originally promulgated. We held that, under *National Mining*, EPA's "denial of a revision-seeking petition does not allow review of alleged substantive defects *in the original rule* even under the deferential standards applicable to review of such denials, outside the statutory limitations period running from the rule['s] original promulgation." *Id.* at 1113 (emphasis added). In other words, *National Mining* "require[d] us to treat ARTBA's petition to EPA as a challenge to the regulations it sought revised." *Id.* at 1110. As a result, dismissal was necessary unless the petition satisfied the exception for after-arising grounds, which it did not. *See id.*

Neither decision controls here, where the 2017 and 2018 petitions for review challenge not the point of obligation regulation as originally promulgated in 2010, but the failure to amend the regulation in light of changed circumstances flagged by EPA in 2015. EPA rejected that argument in 2017, and the petitioners sought review of the rejection within sixty days. In substance as well as form, the challenge was to the 2017 refusal to amend, not to the underlying 2010 regulation. Under these circumstances, there was no risk of circumventing the original time limit. Therefore, there was also no reason to treat the 2010 promulgation and the 2017 refusal to amend as one-and-the-same agency action, despite binding APA definitions treating them as separate.

Precedent aside, EPA's proposed approach—making the after-arising provision the exclusive vehicle for challenging refusals to amend regulations based on new information or changed circumstances—creates various difficulties. For one thing, there is a conceptual mismatch between that provision and these kinds of challenges. Though the after-arising exception and the opportunity to seek rule revision based on post-rulemaking events may seem similar, the first allows an intervening event to secure judicial review on the basis of defects extant at the time of the rulemaking, whereas the second allows review on the question whether intervening events have fatally undermined the original justification for the rule. The arrow of time runs forward, not backward, so it is at best awkward—and at worst incoherent—to speak of a *later* development rendering unlawful an *earlier* promulgation. Economic developments in 2015 may have made it arbitrary for EPA to adhere to the point of obligation rule in 2017, but they cannot have retroactively made arbitrary its promulgation in 2010.

Even worse, the Clean Air Act's after-arising provision, if used to judge the timeliness of challenges based on new information, would be difficult to apply, capriciously narrow, or both. To satisfy that provision, a petition for review must be both (i) based "solely" on after-arising grounds and (ii) filed "within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1). Yet the case for changing an environmental regulation will almost never manifest itself at one discrete moment. Instead, it will accumulate progressively over time, as scientific knowledge advances or economic conditions change. And so, under EPA's approach, the relevant filing deadlines would become practically unknowable. When did some environmental risk become serious and obvious enough to compel a rulemaking to strengthen an existing regulation? That will usually be a hard question, and it would be little short

of miraculous if the answer turned out to be on a date certain within sixty days of the filing of a petition for review, as required to satisfy the after-arising provision.

In contrast, the approach we have sketched out produces simple questions and discernible deadlines: ask when EPA denied the rulemaking petition, then add sixty days. If possible, we should avoid trying to fix arbitrarily precise accrual dates for events that develop incrementally over time. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–21 (2002). And we should avoid jurisdictional tests that are complex as opposed to straightforward. *See, e.g.*, *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Treating the denial of a petition to amend a rule based on changed circumstances as reviewable agency action honors both principles, while attempting to shoehorn such denials into the after-arising provision does the opposite.

We acknowledge that, in *Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975), we assumed that the after-arising provision would govern review of orders denying petitions to modify EPA rules based on changed circumstances. But our only holdings were that such petitions must first be presented to EPA, *id.* at 666, and then are reviewable directly in the courts of appeals, *id.* at 657–65. Moreover, our assumption was understandable in context; the petitioners had missed the statutory deadline to file a petition for review (then thirty days), *see id.* at 657, so they pressed alternative jurisdictional theories (involving either district-court review or the after-arising provision) that would avoid that deadline. Furthermore, we expressly reserved the precise bounds of what constituted a petition based solely on after-arising grounds. *See id.* at 666–68. Finally, we stressed that review should generally be available "when new information casts doubt upon the validity of a [regulatory] standard." *Id.* at 665. At the time, the

after-arising provision contained no separate deadline requiring a petition for review to be filed within sixty days of the after-arising ground. *See id.* at 657 n.3. So the difference between "direct review" of a regulation through the after-arising provision and review of a "refusal to revise" the regulation appeared largely semantic. *See id.* at 666. But, two years after *Oljato* was decided, Congress amended section 7607(b)(1) to include the separate filing deadline, *see* Pub. L. No. 95-95 § 305(c)(3), 91 Stat. 685, 776 (1977), which, as explained above, made the after-arising provision a singularly poor vehicle for securing the review that *Oljato* assumed would be readily available.

After *Oljato*, we held in *Group Against Smog & Pollution v. EPA*, 665 F.2d 1284 (D.C. Cir. 1981), that the failure to challenge a 1974 regulation within the original sixty-day deadline did not bar "judicial review of the agency's subsequent refusal to revise the standard on the basis of new information." *Id*. at 1291. Quoting liberally from *Oljato*, we suggested that such review would proceed through the after-arising provision. *Id.* at 1289. But we permitted review even though the after-arising provision, as amended, could not have applied. The case involved comments filed with EPA in April 1977, which we treated as a petition for a rulemaking. *Id.* at 1290 & n.47. On April 13, 1978, EPA declined to amend the rule as requested. *Id.* at 1288. The ensuing petition for review was filed on June 12, 1978—more than a year after the technological changes discussed in the comments, but precisely sixty days after the refusal to amend. *See id.* Because the petition for review was not filed within sixty days of the asserted after-arising grounds, the after-arising provision plainly did not apply. So, review must have rested on the theory that the refusal to amend was itself a reviewable action triggering its own sixty-day filing window.

The approach we follow here—treating denials of rulemakings based on new facts as independently reviewable decisions—does not reduce the after-arising provision to surplusage. Our cases have recognized other circumstances triggering the after-arising provision, including judicial decisions that significantly "changed the legal landscape" faced by petitioners, *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 473 (D.C. Cir. 2013), and "the occurrence of an event that ripens a claim," *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102, 129 (D.C. Cir. 2012) (per curiam). In cases like these—where, for example, an intervening statute, regulation, or judicial decision extends old regulations to new parties—the after-arising ground is easily dated, the relevant filing deadlines are clear, and so the provision functions predictably. Moreover, where the after-arising provision does apply, it permits the petitioner to contend not only that changed circumstances warrant amending an existing regulation but also that the regulation was unlawful as originally promulgated. *See, e.g.*, *Honeywell*, 705 F.3d at 473.

For these reasons, we conclude that we have jurisdiction to consider the petitioners' argument that EPA arbitrarily refused to amend the point of obligation rule based on the changed circumstances cited by the petitioners.

## 2. After-Arising Grounds Under Section 7607(b)(1)

The February 2016 petitions for review, filed before EPA resolved any of the rulemaking petitions, rested on the alternative jurisdictional theory that EPA's publication of the 2014–16 volume requirements constituted an after-arising ground within the meaning of section 7607(b)(1). Our conclusion above does not moot this question, because if this alternative theory were valid, then the petitioners could directly attack the point of obligation rule as originally promulgated.

Nonetheless, the petitioners have abandoned this theory of jurisdiction. In their merits briefs, they never actually attack the 2010 rule as originally promulgated; instead, they challenge only the 2017 denial of their rulemaking petitions. Moreover, in requesting relief, they do not ask us to set aside the 2010 rule, but only to "vacate the [2017] Denial[] and remand to EPA" for a rulemaking to change the point of obligation rule going forward. Alon Br. 58. And at oral argument, they disclaimed any challenge to the 2010 rule itself and confirmed that their only challenge was to EPA's 2017 refusal to revise the point of obligation rule. *See* Rec. of Oral Argument at 2:18:50–2:19:15.

### 3. Mandatory Reconsideration Under Section 7607(d)(7)(B)

Finally, the petitioners assert jurisdiction under section 7607(d)(7)(B), on the ground that EPA erroneously denied petitions for mandatory reconsideration of the point of obligation rule. To review, section 7607(d)(7)(B) provides in relevant part that only objections "raised . . . during the period for public comment" may be "raised during judicial review." But if the objector "can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule," then EPA must "convene a proceeding for reconsideration of the rule," and any refusal to do so is judicially reviewable. Here, the petitioners assert that the ground for their objections—EPA's statements and actions in its 2014–16 volume regulation—arose "after the period for public comment" on the 2010 point of obligation rule, and that

the objections are "of central relevance to the outcome of the rule."

The petitioners misapprehend the statutory text and structure. Section 7607(d)(7)(B) does not extend the jurisdictional deadline to seek judicial review imposed in section 7607(b)(1); instead, it specifies a non-jurisdictional exhaustion requirement. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014). Its first sentence generally requires parties to raise objections "during the period for public comment" in order to later present them in court. Its second sentence allows a narrow exception when a centrally important objection cannot feasibly be raised during the comment period—either because "the grounds for such objection arose after the period for public comment," or because commenting was otherwise "impracticable." If an objection fits within this exception, the consequences are weighty: EPA *must* grant reconsideration and conduct a new, full-dress, notice-and-comment rulemaking. And if EPA denies reconsideration, the objector may seek judicial review.

This "limited exception" to the normal exhaustion deadline, *Util. Air Regulatory Grp. v. EPA*, 744 F.3d 741, 746 (D.C. Cir. 2014), does not come with a free pass from the subsequent deadline to seek judicial review. To the contrary, the second sentence of section 7607(d)(7)(B) covers only objections that arise after the close of the comment period, yet within the time specified for judicial review. As noted above, that time for judicial review—sixty days from the promulgation of the final rule—is specified in section 7607(b)(1). Section 7607(d)(7)(B) does not enlarge that filing period, but merely fills a narrow gap within it: allowing orderly exhaustion of important objections that "first became known to the petitioner after the comment period ended, but before the period for petitioning for review expired." *Am. Petroleum Inst. v. Costle*,

665 F.2d 1176, 1192 (D.C. Cir. 1981). We recognize that, as a textual matter, the statutory phrase "but within the time specified for review" qualifies the requirement that the grounds must have arisen "after the period for public comment," but not the alternative requirement that "it was impracticable" to raise the objection "during the period for public comment." However, the petitioners do not invoke the impracticability prong of section 7607(d)(7)(B). Moreover, we have construed that prong to cover instances when the final rule was not a logical outgrowth of the proposed rule, *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017) (per curiam), which likewise involve problems during the period for public comment on or petitioning for review of the regulation itself—not problems that arise when circumstances change years or decades later.

The petitioners argued in briefing that the "time specified for judicial review" referenced in section 7607(d)(7)(B) encompasses not only the initial sixty-day window after a rule's promulgation, but also the secondary sixty-day limit from after-arising grounds in the fourth sentence of section 7607(b)(1). But as noted above, the petitioners abandoned at oral argument any reliance on the latter after-arising provision. Moreover, their theory would transform what we have described as a "limited" gap-filling provision, *Util. Air Regulatory Grp.*, 744 F.3d at 746, into a perpetually looming threat of mandatory notice-and-comment reconsideration. Tellingly, the petitioners can cite no case employing section 7607(d)(7)(B)'s mandatory reconsideration procedure for objections that arose after the close of the initial window for judicial review. Their interpretation would "make a mockery of Congress'[s] careful effort to force potential litigants to bring challenges to a rule issued under this statute at the

outset." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 458 (D.C. Cir. 2013) (quotation marks omitted).

Because the petitioners' objections to the point of obligation rule did not arise within the initial window for judicial review of the 2010 point of obligation rule, but only some five years later, EPA properly denied mandatory reconsideration.

**B. Merits of Challenges to EPA's Refusal to Revise the 2010 Point of Obligation Rule**

The Alon Petitioners offer an array of arguments to challenge the denial. None, however, is persuasive.

We are reviewing EPA's denial of a petition for rulemaking to amend the agency's point of obligation rule. *See supra* Part IV.A.1. Accordingly, our review is "'extremely limited' and 'highly deferential.'" *New York v. EPA*, 921 F.3d 257, 261 (D.C. Cir. 2019) (quoting *Massachusetts*, 549 U.S. at 527–28). "To set aside the agency's judgment, [we] must conclude that EPA had not 'adequately explained the facts and policy concerns relied on' or that those facts did not 'have some basis in the record.'" *Id.* (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 653 (D.C. Cir. 2014)). We have no basis for such a conclusion. In denying the petition for rulemaking, EPA considered the "information currently before" it and determined "that the point of obligation is appropriately placed," wrestling with the petitioners' claims to the contrary. EPA Denial at 8, Alon J.A. 62. As is evident from our discussion below, EPA did so with enough thoroughness and reasonableness to satisfy our limited, deferential review.

We start with EPA's reasoning, which petitioners say is arbitrary and capricious. *See* 42 U.S.C. § 7607(d)(9)(A).

At the root of petitioners' claim is a single premise: that the current point of obligation misaligns incentives by requiring those who refine fossil fuel, but not those who blend it, to meet the RFS program's annual standards. In petitioners' view, this misalignment forces refiners to purchase RINs to satisfy their RFS obligations, jacking up their costs, while giving windfall profits to blenders, who produce (but don't consume) RINs. From this cycle of "RINsanity," petitioners say, flow harms galore. Alon Reply Br. 25. Higher RIN prices not only threaten the financial viability of refiners (putting our economy and energy security in jeopardy), *see, e.g.*, Alon Br. 46, but they incentivize RIN hoarding, which feeds market volatility, and gives some market participants an unfair leg up, *see, e.g.*, *id*. at 40.

The problem with this argument, however, is that EPA reasonably explained why, in its view, there is no misalignment in the RFS program. According to EPA, refiners "recover the cost of the RINs they purchase" by passing that cost along in the form of "higher prices for the petroleum based fuels they produce." EPA Denial at 25, Alon J.A. 79. It grounded that conclusion in studies and data in the record. EPA and the authors of the pertinent studies took advantage of the fact that there are pairs of petroleum products in which one variant is subject to the RIN obligation (such variants being awkwardly called "obligated fuels"), whereas its not-quite-identical twin is not. For example, gasoline and diesel sold for use in the United States are "obligated," whereas the same fuels sold for export are not. EPA Denial at 23, Alon J.A. 77. The same goes for domestic diesel fuel, which is "obligated," and jet fuel, which is not. Christopher R. Knittel et al., The Pass-Through of RIN Prices to Wholesale and Retail Fuels Under the Renewable Fuel Standard 4 (July 2015) (Knittel), Alon J.A. 534. Comparing these pairs, the agency found that as RIN prices increased, a gap "open[ed] up between" the price for obligated

and unobligated fuels, a gap rather precisely matching the contemporaneous increase in RIN price—a strong indication that refiners were "recoup[ing] the costs associated with RIN prices." EPA Denial at 23, Alon J.A. 77.

Further confirming the price relationship, Professor Knittel and his colleagues found that 73% of a change in RIN price was passed through in the form of higher petroleum prices in the same day, 98% within two business days. Knittel 26, Alon J.A. 536.

Reviewing the findings, EPA (accurately) reported that the papers by Knittel and his colleagues, and by Argus Consulting Services, "concluded that the RIN cost was generally included in the sale prices of obligated fuels." EPA Denial at 25, Alon J.A. 79; *see* Knittel 26, Alon J.A. 536; Argus Consulting Services, Do Obligated Parties Include RINs Costs in Product Prices? 15 (Feb. 2017), Alon J.A. 564 ("There are very specific correlating price data for diesel that indicate that refiners . . . pass along the RINs cost . . . .").

A similar analysis, EPA concluded, reveals that just as (obligated) refiners do not pay excess costs, neither do blenders (who are not obligated under the program) nor integrated refiners (who perform their own in-house blending) reap windfall profits. True, both earn RINs, without purchasing them on the open market, by blending renewable fuel into petroleum blendstock. And true, as well, both can sell those RINs, enjoying whatever revenues market conditions and their own efficiencies permit. But as EPA quite accurately explained, this is only half the equation. In a competitive market there's no such thing as a free lunch, and blenders and integrated refiners pay their tab just as others do; they just do so indirectly. To offer finished fuel *without attached RINs* at a competitive price, these entities must discount their blended

fuel by roughly the value of the RINs that they detached and kept for themselves. EPA Denial at 29, Alon J.A. 83. In other words, they "sell the finished transportation fuel at a loss," but "maintain[] profitability through RIN sales." *Id*. at 27–28, 29, Alon J.A. 81–82, 83.

To be sure, in response to EPA's proposed denial, commenters criticized the studies relied on by the agency. They contended, for example, that Professor Knittel and his colleagues erred by removing certain spreads from the analysis, by including others, and by pooling the results of various comparisons. *See* EPA Denial at 25, Alon J.A. 79. But petitioners have not raised these arguments here, and for that reason we do not consider them. While petitioners *do* complain that EPA relied on a "preliminary" analysis, *see* Alon Br. 54; Alon Reply Br. 23, that objection—whatever its persuasive force—says nothing about the other studies in the record (for example, by Professor Knittel et al.).

Petitioners try, instead, to trace various refiner problems to EPA's refusal to obligate blenders. They suggest that the alleged misplacement of the point of obligation causes bankruptcies, *see, e.g.*, Alon Br. 3, 47, and inflicts economic hardship on small refineries, *see, e.g.*, *id*. at 49, especially in the form of inflicting wildly disproportionate RIN acquisition costs on them, *see, e.g.*, Alon Reply Br. 26. But some of these events occurred *after* EPA issued its denial, *see, e.g.*, Alon Br. 49 ("following the Denial"); Alon Reply Br. 26 ("just after the Denial"), and are therefore not properly before us, *see Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). More importantly, the claims presuppose that refiners cannot recover their RIN costs and that blenders reap windfall profits—suppositions that, as discussed above, EPA reasonably rejected.

Petitioners respond by plucking snippets from the denial, stringing them together with contrasting (bolded) conjunctions, and asserting that EPA's "discussion of RIN prices" is "irreconcilably inconsistent." Alon Br. 53. But we find no inconsistency on EPA's part.

> . . . RIN prices had no "significant impact on retail gasoline (E10) prices," JA75;
>
> *although* "RINs . . . provide a price signal to consumers to help achieve . . . greater renewable fuel production and use," JA75.

Alon Br. 53 (second and third alterations in original) (quoting EPA Denial at 21, Alon J.A. 75). At first blush, the two comments, located on the very same page, seem inconsistent. How could RIN prices have no "significant impact" on retail prices, while, at the same time, provide "a price signal to consumers"?

They can do so for the simple reason that the remarks refer to different things, a detail omitted from petitioners' brief. This becomes apparent when the passage from which petitioners plucked their quotes (bolded and underscored below) is viewed in full:

> External, non-EPA assessments similarly concluded that increased **RIN prices had not had a significant impact on retail gasoline (E10) prices**. When RIN prices rise, the market price of the petroleum blendstocks produced by refineries also rise to cover the increased RIN costs, in much the same way as they would rise in response to higher crude oil prices. The effective price of renewable fuels (the price of the

renewable fuel with attached RIN minus the RIN price), however, *decreases* as RIN prices increase. When renewable fuels are blended into petroleum fuels these two price impacts generally offset one another for fuel blends such as E10 with a renewable content approximately equal to the required renewable fuel percentage standard. Higher RIN prices also generally result in higher prices for fuels with lower renewable content (such as E0 or petroleum diesel) and lower prices for fuels with higher renewable content (such as E85 or B20). The cost of the RIN therefore serves as a cross-subsidy, reducing the price of renewable fuels and increasing the price of petroleum based fuels in transportation fuel blends, thus incentivizing increased blending of renewable fuels into the transportation fuel pool. In this way the **RINs** also help **provide a price signal to consumers to help achieve** the Congressional goals of **greater renewable fuel production and use**. Fuels with higher renewable content are relatively cheaper to consumers than they would be absent high RIN prices, while fuels with lower renewable content are relatively more expensive when RIN prices are high.

EPA Denial at 20–21, Alon J.A. 74–75.

As we can see, the first statement (no significant price impact) is referring to the price of E10—a blend of 90% gasoline, 10% ethanol. As EPA explained, RINs work as a "cross-subsidy," effectively taxing the use of petroleum-based fuels (e.g., gasoline) and subsidizing the use of renewables (e.g., ethanol) in making a blended transportation fuel like E10. EPA Denial at 21, Alon J.A. 75.

Before we dig in further, let's take a step back. We must first recognize that EPA assumes that we are talking of a market where the RFS program, in effect, mandates minimum levels of renewables in marketed fuels, a mandate that necessarily impacts fuel prices. EPA is *not* making a claim that the mandatory inclusion of renewables in transportation fuel renders a gallon of gasoline lawfully purchased at the pump cheaper than it would have been absent the RFS program.

To see what this means, start on the subsidy side: Suppose a blender can realize $2.25 on a gallon of ethanol with an attached RIN. If the blender can detach and sell that RIN for $0.05, then the net ethanol value is only $2.20—a $0.05 savings that in a competitive market should pass through to consumers. Now take the tax side: Because refiners must purchase RINs to satisfy the RFS obligations that arise from selling gasoline to blenders, a blender's value for a gallon of gasoline may rise, due to the RFS program, from, say, $2.75 to $2.76. *See* Dallas Burkholder, Office of Transportation & Air Quality, EPA, A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects 17, EPA-HQ-OAR-2016-0544-0009 (May 14, 2015), Alon J.A. 337. As a result of both price impacts, EPA described, blended fuels with a higher percentage of renewable content (e.g., 85% ethanol) will be cheaper than they would have been (absent the program), whereas fuels with a lower percentage of renewable content (e.g., pure gasoline) will be more costly than they would have been (absent the program). EPA Denial at 21, Alon J.A. 75. For E10, the "two price impacts generally offset one another," so (back to the first statement) any change in RIN price generally has no "significant impact on" the E10 price. *Id.*

But that's just E10. There *is* an effect (of differing magnitude) on, say, E85 or E0. And that is where the second statement ("provide a price signal") comes in: the signal arises

from a comparison of *relative prices* across the *spectrum* of transportation fuels. Again, as EPA explains, "[f]uels with higher renewable content are relatively cheaper to consumers than they would be absent high RIN prices, while fuels with lower renewable content are relatively more expensive when RIN prices are high." *Id*. The two statements are consistent.

Continuing the search for inconsistency, petitioners direct our attention to "EPA's past pronouncements." Alon Br. 50. In them, they see an irrational "about-face"—with EPA saying, at first, that "low RIN prices [were] a sign that the [RFS program] was working," but claiming, now, "that high RIN prices are . . . *desirable*." *Id*. at 51–52. Again, that's not quite right. All EPA originally said was that when it first adopted the point of obligation, it did so based, in part, on its "expectation at that time that there would be an excess of RINs at low cost." Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 74 Fed. Reg. 24,904, 24,963/2 (May 26, 2009) (proposed rule); *see also* Alon Br. 50 (citing EPA Denial at 13, Alon J.A. 67 (citing, in turn, 74 Fed. Reg. at 24,963)). EPA did not suggest that low RIN prices were a sign of market health—nor that high prices were a cause for alarm.

In any case, EPA addressed petitioners' concern over high RIN prices head on; the agency explicitly determined, on the current record, that "higher RIN prices" are not "indicative of a dysfunctional RIN market." EPA Denial at 19, Alon J.A. 73. Rather, EPA explained, these prices accurately reflect the increasing cost associated with "getting ever-greater volumes of renewable fuel into the transportation fuel pool—the explicit goal [of] the RFS program." *Id*. Put more bluntly, the increases in RIN prices are a completely understandable effect of the program's ever-increasing pressure to expand renewable volumes. Pushing out along the supply curve takes the raw

market price of the RIN-eligible fuel steadily into higher realms—except to the extent that production innovations or economies may tend to lower costs. So far as appears, it has nothing to do with EPA's allocation of the obligation.

What about EPA's concern, petitioners ask, that including blenders in the point of obligation would expand the number of obligated parties and, as a result, ratchet up the program's complexity? Isn't that hard to square with EPA's claim, made years earlier, that "essentially all downstream blenders . . . are [*already*] regulated parties"? Alon Br. 42 (quoting 75 Fed. Reg. at 14,722/2). Again, not at all. Although the participation of all (or nearly all) blenders in the RIN market subjects them to RFS registration, recordkeeping, and reporting requirements, "the majority of these downstream [regulated] parties are . . . currently *not* obligated parties." EPA Denial at 69, Alon J.A. 123 (emphasis added). As EPA explained, there "is a significant distinction between being a 'regulated party' and being an 'obligated party.'" *Id*. "Obligated parties must meet all of [the requirements faced by regulated parties] *and also* calculate an annual renewable volume obligation, acquire the appropriate number of RINs in the market, practic[e] due diligence to ensure [the RINs'] validity, file annual compliance reports demonstrating compliance, and maintain records to that effect." *Id*. at 69 n.205, Alon J.A. 123 (emphasis added); *see, e.g.*, 40 C.F.R. §§ 80.1427(a), 80.1450(a), 80.1451(a), 80.1454(a). It was not unreasonable for EPA to conclude that imposing these burdens on additional entities would add to the program's complexity (and therefore be undesirable absent an adequate offsetting benefit).

Nor was it unreasonable to find that going down this route—overhauling a foundational element of the program—would create "uncertainty in the fuels marketplace." EPA Denial at 2, Alon J.A. 56. As EPA said, "all parties regulated

in the RFS program have made significant investments and decisions about their participation in the program and their position in the market on the basis of the existing regulations, including the definition of obligated parties." EPA Denial at 79, Alon J.A. 133. In these circumstances, it isn't hard to imagine how changing course could throw players off their game. Of course, as petitioners note, uncertainty may have "plagued the RFS Program for years." Alon Br. 37. But true or not, EPA needn't pile on; the cure for uncertainty isn't spawning more uncertainty.

Taking a step back, petitioners launch a closing broadside against the entire process. They assert that EPA "disregarded this Court's remand" in *ACE*, 864 F.3d at 737, and arbitrarily credited some comments over others. Alon Br. 31–32, 55–56. But the *ACE* remand required, at most, that the agency "address the point of obligation issue." 864 F.3d at 737. And, as detailed throughout this opinion, the agency has done so reasonably, analyzing the data and explaining its decision. Nothing more was required.

\* \* \*

We have considered the Alon Petitioners' other arguments and have found them to be either without merit or, in the case of the argument relying on 42 U.S.C. § 7545(*o*)(5)(A), *see* Alon Br. 34, insufficiently developed, *see, e.g.*, *Masias v. EPA*, 906 F.3d 1069, 1077 (D.C. Cir. 2018). For the foregoing reasons, the petitions for review are denied.

## V. 2017 Annual Volumetric Rule

We turn now to the Coffeyville Petitioners' challenges.

## A. Point of Obligation

We first consider the Coffeyville Petitioners' challenge to EPA's decision in the 2017 Rule not to reassess which categories of industry players are "obligated parties" under the renewable fuel program. As the Coffeyville Petitioners read it, the statutory provision requiring EPA to set annual renewable fuel percentage standards also imposes on EPA a nondiscretionary duty to reconsider—*every year*—which types of entities are obligated to demonstrate to EPA compliance with the percentage standards. *See* 42 U.S.C. § 7545(*o*)(3)(B). They claim EPA shirked that duty when it treated the issue as beyond the scope of its 2017 annual rulemaking. EPA counters that it identified the obligated parties in 2007 pursuant to Congress's mandate to set "compliance provisions" for the new renewable fuel program, *id.* § 7545(*o*)(2), reaffirmed that decision in 2010, and that nothing in the mandate to calculate the annual percentage standards requires it to reconsider the point of obligation each year. EPA also asserts that it appropriately addressed the Coffeyville Petitioners' complaints that it obligated the wrong parties in a separate proceeding from its annual volumetric rulemaking.

### 1. Jurisdiction

EPA and a coalition of Respondent-Intervenors representing the renewable fuel and refinery industries assert that we lack jurisdiction because the Coffeyville Petitioners effectively challenge the compliance rule that has been on the books for a decade or so, *see* 40 C.F.R. § 80.1406(a)(1), and did not petition within 60 days of its publication or within 60 days of any valid "grounds arising" thereafter. *See* 42 U.S.C. § 7607(b)(1); *Med. Waste Inst. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). But petitioners are not challenging EPA's decision to adopt the rule in 2007 or retain it in 2010. Rather,

they contend that the provision calling on EPA to set annual volumes of biofuels "applicable to refineries, blenders, and importers, as appropriate," requires EPA to reassess each year whether the point of obligation set when the agency established the program is still "appropriate," or if EPA should re-assign it and restructure the RIN market and other compliance infrastructure going forward. *See* 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I). That challenge was timely filed within 60 days of the promulgation of the annual fuel standards. *See supra* Part IV.A.1.

## 2. Merits

This dispute turns on the roles of two provisions of the statute directing the EPA to establish and run a Renewable Fuel Program, 42 U.S.C. § 7545(*o*)—paragraphs (2) and (3).

Paragraph (2) directs EPA to "promulgate regulations" setting up a program to "ensure that transportation fuel sold or introduced into commerce in the United States . . . contains at least the applicable volume[s] of renewable fuel," as specified in subparagraph (2)(B). *Id.* § 7545(*o*)(2)(A)(i). Among the parameters Congress required EPA to include were "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate," to ensure that the requirements of paragraph (2), including the applicable volume requirements specified in subparagraph (2)(B), are met. *Id.* § 7545(*o*)(2)(A)(iii)(I), (B). There is no question that EPA has authority to set those parameters, including the point of obligation, and to adjust them if a change is needed.

Paragraph (3), in turn, requires EPA to determine and publish annual renewable fuel obligations designed to "ensure[] that" the applicable volumes specified in paragraph (2) are met. *Id.* § 7545(*o*)(3)(B)(i). Those renewable fuel obligations must:

(I)     be applicable to refineries, blenders, and importers, as appropriate;

(II)    be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

(III)   . . . consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

*Id.* § 7545(*o*)(3)(B)(ii)(I)–(III).

The parties' dispute centers on the meaning of "as appropriate" in subclause (3)(B)(ii)(I).  The Coffeyville Petitioners contend that the phrase unambiguously requires EPA annually to reconsider which parties it is "appropriate" to obligate to meet the renewable fuel obligations.  EPA responds that the statute is, at most, ambiguous as to whether Congress expected EPA annually to revisit the obligated-parties designation, or whether the agency may generally rely on the "appropriate[ness]" finding it made pursuant to its paragraph (2) authority.  We begin by asking "whether Congress has directly spoken to the precise question at issue," and conclude that it has not.  *Chevron*, 467 U.S. at 842.

EPA reads "as appropriate" in paragraph (3) to mean that the agency has "discretion" to decide whether, when, and how to reassess which of three types of industry actors—refineries, blenders, and importers—should continue to bear the point of obligation, as originally designated in the compliance provisions.  *See* EPA Denial, Coffeyville J.A. 779–80.  At oral argument, the agency conceded that its exercise of this discretion is reviewable, so that the exclusion of the point of obligation issue from an annual rulemaking could, under other circumstances, constitute an abuse of discretion.  Rec. of Oral Arg. 1:22:22–1:24:00; 1:37:45–1:40:11.

The Coffeyville Petitioners object that the phase "applicable . . . as appropriate" means applicable as contemporaneously determined to be appropriate in the annual volumetric rulemakings. Coffeyville Br. 30–33; *see also* Conc. Op. 4–5, 7. But paragraph (3) does not specify when or in what context EPA must make its appropriateness determination, nor does the phrase "as appropriate" itself specify a particular temporal dimension—as between, for example, parties appropriately designated in the past (as EPA interprets it) and parties now appropriately selected (as Coffeyville insists). The term "appropriate" "naturally and traditionally includes consideration of all the relevant factors," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (quoting *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part)), but it does not dictate *when* that consideration must be made. In other words, the requirement that the point of obligation be "appropriate" is at most grounds for assessing whether the agency adequately explained its policy choices regarding the appropriateness determination, not for imposing our own gloss on that broad term as a matter of law. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2448–49 (2019) (Kavanaugh, J., concurring in the judgment) ("[S]ome cases involve regulations that employ broad and open-ended terms like 'reasonable,' '*appropriate*,' 'feasible,' or 'practicable.' Those kinds of terms afford agencies broad policy discretion, and courts allow an agency to reasonably exercise its discretion to choose among the options allowed by the text of the rule. But that is more *State Farm* than *Auer*" or *Chevron* (emphasis added)). Here, as explained below, EPA reasonably exercised its discretion, and explained its decision, to address the point of obligation issue in a separate proceeding from its annual volumetric rulemaking.

The fact that paragraphs (2) and (3) both include the phrase "as appropriate" does not make the Coffeyville Petitioners' the

only permissible interpretation. Even if, as our colleague contends, Conc. Op. 7, the two phrases bear the exact same meaning, *but see* Coffeyville Br. 30–31 (arguing that paragraphs (2) and (3) are "worded differently" and have "different contexts"), paragraph (3) simply does not dictate when or in what context EPA must make the appropriateness determination. It is the surrounding context, not the phrases themselves, that suggests when EPA might make that choice.

Unable to point to any express textual requirement that EPA annually reconsider the point of obligation, the Coffeyville Petitioners contend that, had Congress intended to allow EPA in annual volumetric rulemakings to rest on its paragraph (2) appropriateness determination, subclause (3)(B)(ii)(I) could have more simply cross-referenced paragraph (2). But replacing subclause (3)(B)(ii)(I) with a simpler cross-reference would not have achieved quite the same effect. While refineries, blenders, importers, and distributors may all be subject to compliance provisions under paragraph (2), paragraph (3)'s applicability provision points to a more limited universe of potential obligated parties—to refineries, blenders, and importers, but *not* distributors. That supports EPA's understanding of subclause (3)(B)(ii)(I) as a cross-reference that also clarifies a limit on EPA's options in setting the point of obligation. *See* 72 Fed. Reg. at 23,923/2 (preamble for compliance rule referencing paragraph (3)'s applicability provision).

We are unpersuaded by the suggestion that such limitation was so clear even without subclause (3)(B)(ii)(I) that EPA's reading of that applicability provision renders it superfluous. The suggestion is that, because distributors do not "introduce" fuel into commerce, they could not be obligated parties in any event, with or without the applicability provision. Our colleague posits that blenders—but not distributors—can in fact "introduce" transportation fuel into commerce by blending

gasoline and diesel fuel with other fuels that have not already been introduced by someone else.  Conc. Op. 11.  But that argument rests on a complicated series of inferences from spare statutory text, as well as post-enactment regulations that do not necessarily show what the statute must have meant.  For example, our colleague reasonably infers that the national "volume[] of transportation fuel," 42 U.S.C. § 7545(*o*)(3)(A), must be counted at the first moment each gallon of fuel enters commerce, in order to avoid double-counting.  But, the statute nowhere states the point directly.  Still less clearly does the statute state our colleague's corollary—necessary to the surplusage argument—that the point of obligation must also be *placed*, if at all, at the first moment a gallon of fuel enters commerce.  That corollary is less obvious, because the statutory link between the point of obligation and entry into commerce is not ironclad:  All parties agree that *not every* gallon of transportation fuel must be subject to the point of obligation upon entry into commerce.  The statute plainly allows EPA to obligate an "appropriate" subset of the three categories of parties.  And obligating blenders would involve double counting unless the transportation fuel they use to create blends were not already counted upon its importation or sale to them.  Under the circumstances, it is reasonable to read subclause (3)(B)(ii)(I) as clarifying what is at best a non-obvious inference that distributors cannot be subjected to the point of obligation.

So subclause (3)(B)(ii)(I) as EPA reads it is not a superfluity, but makes clear that EPA may have permissibly placed the point of obligation on refineries, blenders, and importers, but not distributors.  For the same reason, subclause (3)(B)(ii)(III), which requires that the annual standards apply "to all categories of persons specified in subclause (I)," *id.* § 7545(*o*)(3)(B)(ii)(III), does not contain what our colleague views as an unnecessary double cross-reference to paragraph

(2), because it, too, is operative in not just cross-referencing, but also clarifying a limit on the three permissible targets of its "single applicable percentage."

The thrust of the Coffeyville Petitioners' retort—that if Congress had wanted to confer discretion or provide a limiting cross-reference to paragraph (2), it would have said so more plainly—applies with greater force against their own reading. Had Congress intended EPA to consider on an annual basis whether to redo the point of obligation designation—a designation that no-one disputes is a necessary cornerstone of the paragraph (2) compliance provisions—it knew how to impose such a requirement. The Clean Air Act's provisions on ambient air quality, for instance, require EPA to "complete a thorough review" of the air quality standards "at five-year intervals" and "promulgate such new standards as may be appropriate." *Id.* § 7409(d)(1). The Act's provisions controlling hazardous air pollutants emitted from major and area sources require EPA to "review, and revise as necessary" the applicable emission standards "no less often than every 8 years." *Id.* § 7412(d)(6). Paragraph (3) of the RFS program, in contrast, does not tell EPA to "complete a thorough review," or "review, and revise as necessary" its point of obligation decision—or anything even close.

To be sure, EPA's reading is not ineluctable. We do not doubt that Congress could have more directly provided that the renewable fuel obligations do not apply to distributors. *See* Conc. Op. 8. But, for the reasons discussed, we are unconvinced that paragraph (3) plainly requires EPA to consider adjusting the point of obligation each year. *See Valero Energy Corp. v. EPA*, No. 7:17-cv-00004-O, 2017 WL 8780888, at *4 (N.D. Tex. Nov. 28, 2017) (holding that "there is no clear statutory mandate . . . obligating [EPA] to evaluate or adjust . . . what entities are 'appropriate[ly]' forced to comply with" the annual renewable fuel obligations

(alterations in original) (quoting 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I))). Accordingly, we conclude that the meaning of "as appropriate" in paragraph (3) is ambiguous and turn now to whether EPA's construction is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

The difficulty of squaring the Coffeyville Petitioners' reading of "as appropriate" with the structure and purpose of the statute convinces us of the reasonableness of EPA's interpretation. As a structural matter, the RFS program contains not only "annual" volumetric determinations, Conc. Op. 1, but also a slew of compliance provisions that are not annually re-determined. As a practical matter, the point of obligation is the foundational "compliance provision" of the entire renewable fuels program; EPA could not "ensure" that applicable volumes of renewable fuels are introduced into the nation's transportation fuel supply without designating the parties responsible for carrying the renewable fuel standards into operation. *Id.* § 7545(*o*)(2)(A)(i). To that end, in writing the compliance provisions, EPA placed the renewable fuel obligation on the entities at the head of the United States supply chain for nonrenewable fuels—domestic refiners, and importers of fuel refined elsewhere. *See* 72 Fed. Reg. at 23,923–24. After additional consideration, EPA in 2010 adhered to that decision. *See* 75 Fed. Reg. at 14,721–22 (codified at 40 C.F.R. § 80.1406(a)(1)); *see also Monroe Energy*, 750 F.3d at 912. No one challenged EPA's decision in 2007 or 2010, and EPA declined to revisit the issue in response to comments in the 2017 annual rulemaking urging it to shift the 2017 point of obligation to blenders. *See* Response to Comments at 542, Coffeyville J.A. 761.

The focus of the annual rulemakings, in contrast, is to translate the applicable volumes—as specified in paragraph (2), or set according to the process there described—into

percentage requirements for each renewable fuel. 42 U.S.C. § 7545(*o*)(3)(B)(ii). It would be strange indeed if Congress required EPA, as it went about its annual quantitative standard-setting duties, also to rethink a choice so basic to the RFS program's architecture. This implausibility is illuminated by the fact that Congress required EPA to facilitate statutory compliance through a credit trading program, which of necessity requires some year-to-year stability. *See id.* § 7545(*o*)(5). EPA responded by setting up the RIN system, with flexibility anchored to a fixed baseline—the point of obligation. The compliance system is flexible in that RINs may be retired in compliance demonstrations not only in the compliance year during which they were generated, but also throughout the ensuing compliance year, 40 C.F.R. § 80.1427(a)(6), and obligated parties may carry over excess RINs or RIN deficits from year to year, *id.* § 80.1427(a)(1), (5)–(6); *see Monroe Energy*, 750 F.3d at 913.

Annual changes to the point of obligation could cause "disparities in RIN-holdings," leaving formerly obligated parties with "significantly more RINs, including carryover RINs, than they desire or can use" and newly obligated parties with "lower balances than they would desire to protect themselves against shortfalls in RIN availability or RIN price volatility." EPA Denial at 78, Coffeyville J.A. 850. "[A] change to the point of obligation could also cause volatility in the [RIN] market," inhibiting the "ability [of] parties that possess excess carryover RINs to recover the cost of the RINs they hold by selling them to other parties." *Id.* It is not plausible that Congress meant EPA to consider uprooting the baseline of the RFS program every year. The real stretch is that Congress would have imposed such an onerous and potentially disruptive duty merely by use of the phrase "as appropriate."

The Coffeyville Petitioners' reading is not made any more plausible by highlighting the likelihood that, on annual

consideration of the point of obligation, EPA would only need to consider recent information, and likely would stay its course. Even if the point of obligation in fact rarely changed, the mere "reconsider[ation]" of the framework would "likely cause delays to the investments necessary to expand the supply of renewable fuels in the United States." *See* EPA Denial at 2, Coffeyville J.A. 774. EPA reasoned that "fuel[] industry participants [would] withhold significant investment decisions until the EPA's final decision and the fallout from the decision are known." *Id.* at 81–82, Coffeyville J.A. 853–54. Insisting that the issue be on the regulatory agenda every year would sow "significant market uncertainty and potential turmoil" into the RFS program without offsetting benefit. *Id.*

Furthermore, any requirement that an agency repeatedly go through a regulatory process on an issue that promises to draw a regular parade of criticism from interest groups with ample resources is itself burdensome. *See AT&T Corp. v. FCC*, 220 F.3d 607, 630–31 (D.C. Cir. 2000). This issue is no exception. As discussed above, EPA in 2016 and 2017 considered and decided against reopening its point of obligation rule. In so doing, it received upwards of 18,000 comments and published an exhaustive, 85-page decision. *See* EPA Denial at 1–85, Coffeyville J.A. 771–857. "Given the time pressure associated with its annual standards rulemaking," EPA believes it would not be feasible or worthwhile to undertake such reconsideration annually. *Id.* at 7 n.10, Coffeyville J.A. 779. Indeed, as EPA acknowledged at oral argument, the agency "has been late on [its annual rules] before," even "when [it hasn't] taken up the point of obligation." Rec. of Oral Arg. 1:25:44–52. "[A]dd[ing] on the" duty to reassess the point of obligation annually, EPA tells us, "would be a significant burden." *Id.* at 1:25:55–1:26:05. Our colleague doubts that EPA's year-to-year burden would be appreciable, but we see no ground to question EPA's judgment

to the contrary. It seems unlikely that Congress wrote the applicability provision in order to heap that annual duty onto EPA's plate. It seems even less likely given the absence of reason to think that yearly second-guessing of program fundamentals makes sense, or that, when and if the need for a program restructuring arises, EPA would fail to act. Indeed, the statute elsewhere explicitly requires EPA to conduct "periodic reviews of . . . the feasibility of achieving compliance with the [applicable volume] requirements." 42 U.S.C. § 7545(*o*)(11). That provision has not been briefed, but would appear to require EPA to reconsider the point of obligation if it concluded that its placement was obstructing compliance.

Finally, EPA's approach coheres with basic principles of administrative law. In general, the choice between various procedural channels lies within the "informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). That discretion properly includes judgments about the scope of rulemakings and when to relegate ancillary issues to separate proceedings: "Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop." *Massachusetts*, 549 U.S. at 524; *see, e.g.*, *Grp. Against Smog & Pollution*, 665 F.2d at 1292 (". . . EPA cannot soundly be charged with arbitrariness merely because it chose a separate rulemaking proceeding as the process for proposing a revised standard in lieu of an undertaking to do so in the narrower context of the opacity standard proceedings as petitioners requested."). Once the agency has resolved an issue in a separate proceeding, it may defend against related criticism by "simply refer[ing]" to the other proceeding, so long as the "reasoning remains applicable and adequately refutes the challenge." *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1993). EPA reasonably reads "as appropriate," in paragraph (3)(B), to leave undisturbed these background norms of broad but reviewable procedural discretion.

Our holding today does not give EPA the limitless and unreviewable discretion feared by our colleague. As we have said, EPA's determination as to whether it is "appropriate" to reconsider the point of obligation in the context of an annual volumetric rulemaking is reviewable for abuse of discretion. EPA did not abuse its discretion in refusing to do so here. Indeed, it considered whether to change the point of obligation rule in a separate, contemporaneous proceeding that yielded a final order that we also have reviewed and found to be adequately justified. *See supra* Part IV.B. We do not address whether it would be an abuse of discretion for EPA to refuse to reconsider the point of obligation—in an annual volumetric rulemaking or otherwise—in extreme circumstances akin to those posited by our colleague's hypothetical about the continuing study of an abolished tort. *See* Conc. Op. 5.

In sum, we hold that EPA permissibly rejected the claim that paragraph (3) requires the agency annually to reassess the point of obligation in the renewable fuel program. Because EPA has no duty to reconsider the appropriateness of its point of obligation regulation as part of its yearly determination of volumetric requirements, it was not arbitrary for EPA to treat comments complaining that it obligated the wrong parties as appropriately assessed in a separate proceeding, and beyond the scope of proceedings for the 2017 volumetric rulemaking. For these reasons, we deny the Coffeyville Petitioners' petition.

## B. Cellulosic Biofuel Projection

The Coffeyville Petitioners lob a variety of challenges at EPA's cellulosic biofuel projection for 2017. Many of these petitioners, however, raised many of the same arguments before. *See ACE*, 864 F.3d at 727–29 (addressing challenges to EPA's 2014–16 projection). We rejected those arguments once—and do so again.

54

*First*, the Coffeyville Petitioners contend that "EPA's [m]ethodology" for projecting cellulosic biofuel production is invalid because it "[c]hronically [o]verestimates [a]ctual [p]roduction." Coffeyville Br. 40. But that argument—that EPA has "repeatedly . . . overshot the mark," *id*. at 41—doesn't apply to the methodology EPA actually used here, as we found in *ACE*, 864 F.3d at 727–28. As we explained when petitioners deployed this same argument in challenging the 2014–16 projection, "the majority of EPA's prior overestimations" utilized a *different methodology*—one that we rejected in *API*, 706 F.3d at 478–81, and that the EPA accordingly abandoned. *ACE*, 864 F.3d at 727. The new methodology—the one EPA used here—has been applied only twice before. At the time EPA made its final evaluation for 2017, that methodology had (as detailed in the table below) *undershot* for 2015 and *overshot* for 2016. *See* Assessment of the Accuracy of Cellulosic Biofuel Production Projections in 2015 and 2016, EPA-HQ-OAR-2016-0004-3687, at 1–4 (Dec. 12, 2016), Coffeyville J.A. 515–18. This is hardly a pattern of chronic overestimation.

| RFS Compliance Year | | EPA Estimate (millions of RINs) | Actual Production (millions of RINs) | EPA Error ** | Record Citation |
|---|---|---|---|---|---|
| **2015** | Q1 | [No Data in the Record] | | | |
| | Q2 | | | | |
| | Q3 | | | | |
| | Q4 | 35.00 | 53.36 | - 34.4% | J.A. 515 |
| **2016** | Q1 | 230.00 | 198.39* | + 15.9% | J.A. 516–17 |
| | Q2 | | | | |
| | Q3 | | | | |
| | Q4 | | | | |

55

&ast; At the time of EPA's assessment, the agency had actual RIN production data for only the first nine months of 2016 (123.99 million gallons). To calculate actual production for the year, EPA extrapolated the likely RIN generation for the last three months of the year based on the historical relation (a multiple of 1.8) between the average quarterly generation in the first three quarters and that of the last quarter, yielding a figure of 74.39 million RINs for the last quarter. *See* Coffeyville J.A. 516–17.

&ast;&ast; The EPA error has been calculated as the difference between the EPA estimate and actual production, divided by the actual production.

*Second*, the Coffeyville Petitioners claim that EPA failed to generate a projection "based on" the cellulosic biofuel estimate provided by the Energy Information Administration (EIA), as required by statute. 42 U.S.C. § 7545(*o*)(7)(D)(i). That is so, they say, because 96% of EPA's projected volume was biogas, a type of cellulosic biofuel that EIA did not include in its estimate. *See* Coffeyville Br. 43–44. The problem for petitioners, however, is that this closely parallels an argument we rejected in *ACE*: "[W]e do not agree that EPA failed to generate projections 'based on' the [EIA's] estimates," even though those "estimates did not contain figures for [biogas] production—production that accounts for the vast majority of cellulosic biofuel" ("around 90 percent"). *ACE*, 864 F.3d at 724, 729. Here, as there, EPA showed sufficient "respect" for EIA's estimates. *Id*. at 729. When limited to fuels actually analyzed by EIA, EPA's estimates were "very similar" to EIA's, *id*.; *see* 2017 Rule, 81 Fed. Reg. at 89,758/1, a fact that the Coffeyville Petitioners do not contest.

Congress demanded no more. Nothing in the statute required EPA to, as the Coffeyville Petitioners insist, "work[] with the EIA to develop information" about biogas. Coffeyville Br. 44. "[T]he Administrator of the Energy Information Administration shall provide . . . an estimate," 42 U.S.C. § 7545(*o*)(3)(A), and EPA shall "respect" it, *API*, 706

F.3d at 478. That's it. In showing such respect, EPA, of course, must "understand how EIA derived" its estimate. Coffeyville Reply Br. 24. But, contrary to the Coffeyville Petitioners' contention, EPA did just that. The agency identified the types of cellulosic biofuels that EIA considered and then, to test the integrity of its projection, conducted an apples-to-apples comparison, "limiting the scope of [its] projection to the companies assessed by EIA." *See* 2017 Rule, 81 Fed. Reg. at 89,757–58. Nothing more was required.

*Third*, the Coffeyville Petitioners object that EPA relied on "information from the [biogas] industry"—an industry "with a direct financial interest in the outcome of the rule." Coffeyville Br. 45. The Petitioners characterize this as "reliance on undisclosed information." *Id*. But EPA *did* disclose the information from the biogas industry—and that the information came from that industry; it just did so in the aggregate. *See* October 2016 Assessment of Cellulosic Biofuel Production from Biogas (2017), EPA-HQ-OAR-2016-0004-3711, at 2–6 (Dec. 12, 2016), Coffeyville J.A. 536–40. All the agency withheld was company-specific information, claiming that it had to withhold such data as confidential business information, *see id*. at 7, Coffeyville J.A. 541; *see also* 40 C.F.R. § 2.211(b), a claim that petitioners never even attempt to rebut, *see Masias v. EPA*, 906 F.3d 1069, 1077 (D.C. Cir. 2018) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . ." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))).

As for the implication of bias, we have previously upheld EPA's reliance on "biofuel producers' own forecasts." *ACE*, 864 F.3d at 728; *see also API*, 706 F.3d at 478 (recognizing that producers are an "almost inevitable source of information"). Here, as in *ACE*, EPA did not "blindly adopt[]

the facilities' own forecasts"; it "performed its own investigation." 864 F.3d at 728; *see* October 2016 Assessment of Cellulosic Biofuel Production from Biogas, *supra*, at 4, Coffeyville J.A. 538 ("To verify the reasonableness of these projections, EPA compared the projected volume from each registered facility to the registered capacity of that facility."). Petitioners point to no unreasonable step by EPA in its efforts to address "the uncertainty and unreliability identified by the [Coffeyville] Petitioners." *ACE*, 864 F.3d at 728.

*Fourth*, the Coffeyville Petitioners protest EPA's reliance on "facilities' actual production in prior years" as a floor for projecting future cellulosic biofuel production. Coffeyville Br. 46. This was error, they say, because some companies might cease production. Perhaps so. But, as we said in *ACE*, although unforeseen issues "could prevent a producer from meeting" its prior year's production, it was "reasonable" for EPA to expect, as a general matter, "that a company's output would grow year-over-year as the company gained experience." 864 F.3d at 728. This seems especially true in an industry with the government's wind surging at its back. And even were EPA's assumption not true for each company, any one facility's shortfall, EPA explained, could be "off-set" by new facilities coming online or existing facilities exceeding the high end of their projected production range. *See* Renewable Fuel Standard Program—Standards for 2017 and Biomass-Based Diesel Volume for 2018: Response to Comments, EPA-HQ-OAR-2016-0004-3753, at 444 (Dec. 12, 2016), Coffeyville J.A. 707. This explanation fulfills EPA's "duty to articulate a 'reasonable and reasonably explained' approach to setting the low end of the production ranges." *ACE*, 864 F.3d at 729 (quoting *Comtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014)).

*Fifth*, the Coffeyville Petitioners complain that EPA should have based its cellulosic biofuel projections on "actual" prior production. Coffeyville Br. 47. But this backward looking approach would have, in EPA's view, "ignore[d] the potential for facilities . . . to increase their fuel production rates" and would have been "inappropriately conservative" in light of the "year-over-year increases" that EPA had observed "in recent years." 2017 Rule, 81 Fed. Reg. at 89,761/1. We cannot say that in rejecting such an approach EPA violated "its duty to take a 'neutral aim at accuracy.'" *ACE*, 864 F.3d at 727 (quoting *API*, 706 F.3d at 476).

For these reasons, we reject the Coffeyville Petitioners' challenges to EPA's cellulosic biofuel projection for 2017. *See ACE*, 864 F.3d at 729.

## C. Cellulosic Waiver

The Coffeyville Petitioners also challenge EPA's decision to use less than all of its discretionary cellulosic waiver authority to lower the 2017 requirements for advanced biofuel and total renewable fuel. Having reduced the 2017 cellulosic biofuel requirement by 5.189 billion gallons, EPA had authority to reduce the advanced biofuel and total renewable fuel requirements "by the same or a lesser volume." 42 U.S.C. § 7545(*o*)(7)(D)(i). To decide by how much to reduce these statutory requirements, EPA first determines what reduction in the advanced biofuel requirement will yield a "reasonably attainable" volume, and it then mechanically applies an equivalent reduction to the total renewable fuel volume. 2017 Rule, 81 Fed. Reg. at 89,752–53. Petitioners do not directly challenge this methodology. Instead, they argue that EPA applied it arbitrarily in deciding to waive only 4.719 billion gallons of the advanced biofuel volume for 2017, rather than the maximum available waiver of 5.189 billion gallons. We

again reject some of their arguments as foreclosed by precedent and others on their own terms.

*First*, the Coffeyville Petitioners argue that EPA sought to justify its 2017 advanced biofuel volume in part by making an impermissible comparison to the statutory volume set by Congress for 2022. In response to a comment expressing concerns about utilization of non-cellulosic advanced biofuels (which could be food-based) and possible adverse effects on food availability, EPA noted that its "reasonably attainable" non-cellulosic advanced biofuel volume for 2017 (approximately 4 billion gallons) was "somewhat higher than the level envisioned in the statute for 2017" (3.5 billion), "but well below the level of such fuels Congress expected would be used by 2022" (5 billion). Response to Comments at 214, Coffeyville J.A. 689. According to petitioners, "by comparing 2017 volumes with 2022 statutory targets, EPA departed from Congress's intent." Coffeyville Br. 50.

However, nothing in the statute forbids EPA from taking account of future statutory volumes in this way. Although Congress specified presumptively applicable volumes for certain years, it also provided waiver authority to depart from those volumes. Indeed, the discretionary waiver provision necessarily empowers EPA to depart upward from the statutory level of non-cellulosic advanced biofuel for a given year: *reducing* the advanced biofuel volume by *less* than the reduction in cellulosic biofuel, as section 7545(*o*)(7)(D)(i) permits, is mathematically equivalent to *increasing* the volume of non-cellulosic advanced biofuels, to "partially backfill for missing cellulosic biofuel." 2017 Rule, 81 Fed. Reg. at 89,763/1. As we have noted, the cellulosic waiver provision "grants EPA 'broad discretion' to consider a variety of factors" in exercising this authority to depart from the presumptive statutory volumes. *ACE*, 864 F.3d at 733 (quoting *Monroe*

*Energy*, 750 F.3d at 915). In this case, while deflecting a comment about food availability, EPA observed that its non-cellulosic advanced biofuel volume for 2017—while higher than the statutory volume envisioned for that year—was lower than the presumptive statutory volume for the near future. And it then reasonably concluded that this "somewhat higher interim volume reflect[ed] [its] assessment that it is appropriate to allow non-cellulosic advanced biofuels to partially backfill for missing cellulosic volumes in light of the associated [greenhouse gas] and energy security benefits." Response to Comments at 214, Coffeyville J.A. 689.

*Second*, the Coffeyville Petitioners argue that EPA failed to explain its estimate of reasonably attainable 2017 imports of sugarcane ethanol, a type of non-cellulosic advanced biofuel. Sugarcane ethanol imports have varied greatly from year to year, reaching a high of 681 million gallons in 2006 but falling to 64 million gallons in 2014 and 89 million gallons in 2015. *See* 2017 Rule, 81 Fed. Reg. at 89,764. At the time of the 2017 Rule, EPA expected only 76 million gallons to be imported in 2016, but it nonetheless adhered to its proposed estimate of 200 million gallons for 2017—an estimate originally based on EPA's judgment that circumstances in 2017 were "not . . . significantly different" from circumstances in 2016, for which EPA had also projected 200 million gallons. *Id.* at 89,763/3. EPA acknowledged the "recent low import levels," but also cited "the difficulty in precisely identifying the reasons" for the historical "high variability," given "uncertainty" as to market factors including "ongoing growth in gasoline demand in Brazil, and competing world demand for sugar." *Id.* at 89,764–65. The agency accordingly reaffirmed that 200 million gallons "reflects a reasonable intermediate point between the lower levels imported recently and the considerably higher levels that have been achieved in earlier years." *Id.* at 89,765/2.

There is some force to petitioners' objection to EPA's adherence to an estimate well over double the actual imports in the three preceding years. However, our review is "particularly deferential in matters implicating predictive judgments." *Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1015 (D.C. Cir. 2014) (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)). We accordingly upheld EPA's identical 2016 sugarcane ethanol estimate as "reasonable and reasonably explained" in *ACE*, 864 F.3d at 736 (quotation marks omitted). In that case, we held that EPA reasonably "concluded that 'a somewhat lower level of imports will occur than the historic average' of 300 million," based on a similar analysis of market factors. *Id.* (quoting 2014–16 Rule, 80 Fed. Reg. at 77,478/2). Here, we cannot say that one more year of low imports made it arbitrary for EPA to adhere to that same projection for 2017.

*Third*, the Coffeyville Petitioners object to EPA's analysis of supply and demand for regular gasoline (E0) and gasoline with added ethanol (E15 and E85). However, this analysis played no role in EPA's exercise of its discretionary cellulosic waiver authority under section 7545(*o*)(7)(D)(i). As noted above, EPA's exercise of that authority rested entirely on its determination of reasonably attainable advanced biofuel volumes. *See* 2017 Rule, 81 Fed. Reg. at 89,773–74. The disputed analysis of E0, E15, and E85 supported EPA's separate decision not to invoke its "general waiver" authority, under section 7545(*o*)(7)(A)(ii), based on "inadequate domestic supply." *See generally ACE*, 864 F.3d at 705–13. But in their opening brief, petitioners failed to challenge EPA's decision not to invoke that separate waiver provision for 2017. Although their reply brief gestures at this point, "an argument first made in a reply brief is forfeited." *Bartko v. SEC*, 845 F.3d 1217, 1225 n.7 (D.C. Cir. 2017).

*Finally*, the Coffeyville Petitioners take issue with EPA's response to various comments. We have considered these arguments and find them to be without merit.

For these reasons, we reject the Coffeyville Petitioners' challenges to EPA's exercise of its discretionary cellulosic waiver authority to reduce advanced biofuel and total renewable fuel volumes for 2017.

## VI.    2018 Volume for Biomass-Based Diesel

Since 2012, EPA, acting in coordination with the Secretaries of Energy and Agriculture, has calculated the annual applicable volume (also known as the "volume requirement") for biomass-based diesel based on a holistic, backward- and forward-looking consideration of relevant factors. In particular, it has set the volume requirement "based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of" six statutorily enumerated factors: (1) "the impact of the production and use of renewable fuels on the environment"; (2) "the impact of renewable fuels on the energy security of the United States"; (3) "the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel)"; (4) "the impact of renewable fuels on the infrastructure of the United States"; (5) "the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods"; and (6) "the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices." 42 U.S.C. § 7545(*o*)(2)(B)(ii)(I)–(VI).

EPA set the 2018 applicable volume for biomass-based diesel at 2.1 billion gallons, up from 2.0 billion gallons in 2017,

and 1.1 billion gallons above a statutory minimum that Congress set to plateau at 1 billion gallons as of 2012. 2017 Rule, 81 Fed. Reg. at 89,798/1; *see* 42 U.S.C. § 7545(*o*)(2)(B)(i)(IV), (v). NBB had asked EPA to set the biomass-based diesel volume at 2.5 billion gallons, and now challenges the volume EPA set as arbitrary and capricious and contrary to the Clean Air Act.

## A. NBB's Standing

Before considering the merits of NBB's claims, we must satisfy ourselves that NBB has standing to assert them. Respondent-Intervenors, the American Fuel & Petrochemical Manufacturers and the American Petroleum Institute, contend that NBB lacks standing because, they say, it has not shown that the 2017 Rule inflicted a cognizable injury on any of its members.

NBB has associational standing here for the same reasons we held it did in *National Biodiesel Board v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016) (*NBB v. EPA*), where EPA's actions "incentivize[d] . . . compet[ition] with [NBB's members'] domestic production." Here, too, NBB's members "compete with" the other industry players EPA's rule is designed to affect. *Id.* at 1016. Recall that biomass-based diesel is a nested subset of advanced and total renewable fuels, such that NBB's members get (1) a market for compelled buyers of the specified volume of biomass-based diesel, for which they are the exclusive suppliers, plus (2) a market for compelled buyers of advanced and other renewable fuels alongside a broad array of competing suppliers. *See supra* at 6–8, 11. The 2017 Rule preamble explains that biomass-based diesel "compet[es] for research and development dollars with other types of advanced biofuels," and that, "[b]y establishing [the biomass-based diesel] volume requirement[] at [a] level[]

lower than . . . the expected production of [biomass-based diesel]," EPA was "creating the potential for some competition between [biomass-based diesel] and other advanced biofuels to satisfy the advanced biofuel" applicable volume and providing "incentives for the continued development of" those competitors' fuels. 81 Fed. Reg. at 89,797; *see also* EPA Coffeyville Br. 24 ("Above 2.1 billion gallons, biomass-based diesel will have to compete with other types of advanced biofuel."). Such competition will likely "temper to some extent [biomass-based diesel] prices." Final Statutory Factors Assessment for the 2018 Biomass Based Diesel (BBD) Applicable Volume, EPA-HQ-OAR-2016-0004-3708, at 10 (Dec. 12, 2016) (Supplemental Assessment), Coffeyville J.A. 533. That is a cognizable injury to NBB's members. *See NBB v. EPA*, 843 F.3d at 1015–16; *see also Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1299 (D.C. Cir. 2015) (per curiam).

Though NBB failed to identify any of its members—ordinarily a prerequisite for organizations alleging associational standing, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009)—that omission is not fatal here because NBB's members comprise "the entire biomass-based diesel category of the Renewable Fuel Standard[s]" and represent no other interests. Coffeyville J.A. 134. Consistent with "the real purpose of the [standing] inquiry—that is, for the court to be satisfied that the requisite injury really has occurred or will occur in the future to members of the organization[]," *Pub. Citizen v. FTC*, 869 F.2d 1541, 1552 (D.C. Cir. 1989), there is no need to identify injured members when "*all* the members of the organization are affected by the challenged activity," *Summers*, 555 U.S. at 499 (citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958)). Because EPA's rule subjects the biomass-based diesel industry to increased competition, with anticipated pricing effects, NBB "meet[s] the

constitutional prerequisites of injury, causation, and redressability." *NBB v. EPA*, 843 F.3d at 1015.

## B. Merits of NBB's Challenges

NBB advances two challenges to the applicable volume EPA set for biomass-based diesel: First, that EPA erred in considering the interaction of biomass-based diesel with the yet-to-be established 2018 advanced biofuel applicable volume, and second, that EPA's consideration of the six statutory factors was arbitrary and capricious and contrary to law. We reject both claims.

*First*, EPA reasonably chose a 2018 biomass-based diesel applicable volume that would "maintain[] support for growth in [biomass-based diesel] volumes" while also encouraging the "development of other advanced biofuels." 2017 Rule, 81 Fed. Reg. at 89,798/1. Congress directed EPA to consider the lessons learned from its retrospective "review" of the program, apply them in its prospective "analysis of" the six statutory factors, and set a biomass-based diesel volume that will apply fourteen months in the future. *See* 42 U.S.C. § 7545(*o*)(2)(B)(ii).

EPA's approach is consistent with the structure and purposes of the statute. Congress set a minimum applicable volume for biomass-based diesel of one billion gallons for each year from 2012 forward, *id.* § 7545(*o*)(2)(B)(i)(IV), (v), while specifying statutory minimum volumes for the advanced biofuel category containing biomass-based diesel that grow year by year to 21 billion gallons by 2022, *id.* § 7545(*o*)(2)(B)(i)(II), (iii). EPA reasonably concluded that, by nesting biomass-based diesel together with cellulosic (and other unspecified) biofuels within the advanced biofuel category, and specifically charting a higher, steeper, and longer initial growth curve for advanced biofuel, Congress anticipated

that production of other types of advanced biofuels could step up to help meet the advanced biofuel volume requirement. *See* 2017 Rule, 81 Fed. Reg. at 89,797/1. EPA also reasonably concluded that increasing fuel diversity serves one of Congress's primary goals in establishing the Renewable Fuel Standards program: improving the nation's "energy independence and security." *See* Pub. L. No. 110-140, preamble; *see also* 2017 Rule, 81 Fed. Reg. at 89,798/3. EPA also reasonably anticipated that enhanced competition in the advanced biofuels market would help "temper to some extent [biomass-based diesel] prices," Supplemental Assessment 10, Coffeyville J.A. 533, thereby ameliorating Congress's concern that, with a too-high target volume, the "price of biomass-based diesel fuel" would "increase significantly," 42 U.S.C. § 7545(*o*)(7)(E)(ii). And fuel diversity may produce environmental benefits insofar as certain advanced biofuels, such as ethanol from food waste, will "likely have significantly lower impacts on wetlands, ecosystems, and wildlife habitats" than would greater reliance on biomass-based diesel. Supplemental Assessment 6, Coffeyville J.A. 529.

NBB's arguments to the contrary turn on reading the statutory directive that EPA "review . . . the implementation of the program during calendar years specified in the tables," *id.* § 7545(*o*)(2)(B)(ii), to confine EPA's consideration to biomass-based diesel's statutory volumes and actual performance, and to prevent EPA from considering other fuel categories or future years. In particular, NBB takes issue with EPA's consideration of the not-yet-finalized 2018 advanced biofuel applicable volume, which NBB contends led EPA to set the biomass-based diesel volume too low.

NBB's objections are not supported by the text or purpose of the statute. Assuming NBB is right that EPA's "review of the implementation of the program" consists of a retrospective

assessment, the agency must also conduct "an analysis of" six statutory factors. *Id.* § 7545(*o*)(2)(B)(ii). And those factors plainly require a prospective assessment—an assessment that would likely miss "important aspects of the problem," *State Farm*, 463 U.S. at 43, if it ignored the interaction, now and in the future, of the requirements for all the categories of renewable fuels. *See, e.g.*, 42 U.S.C. § 7545(*o*)(2)(B)(ii)(I) (requiring an "analysis of" the "impact of the production and use of renewable fuels on," among other things, "the environment"). Though EPA set the biomass-based diesel requirement lower than NBB wished, Congress did not intend to incentivize growth of biomass-based diesel "at all costs." *ACE*, 864 F.3d at 714 (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013)).

NBB objects that setting the 2018 biomass-based diesel applicable volume below expected production might lead to a depressed advanced biofuel volume for 2018. But the agency specifically anticipated "that the 2018 advanced biofuel requirement will be larger than the 2017 advanced biofuel volume requirement." 2017 Rule, 81 Fed. Reg. at 89,798/1. EPA has never set the biomass-based diesel applicable volume at the "maximum potential production" level, *id.* at 89,799/3, yet the "growing supply of" biomass-based diesel has consistently "allowed EPA to establish higher advanced biofuel" applicable volumes, *id.* at 89,797/3. EPA opted for "allowing room within the advanced biofuel volume requirement for the participation of non-[biomass-based diesel] advanced fuels" as a reasonable way "to encourage the development and production of a variety of advanced biofuels over the long term without reducing the incentive for [biomass-based diesel] beyond the [biomass-based diesel applicable volume] in 2018." *Id.* at 89,797–98.

*Second*, in setting the 2018 biomass-based diesel applicable volume, EPA reasonably compared the advantages and disadvantages of biomass-based diesel to those of other fuels. NBB contends that the statute confines EPA to assessing advantages of biomass-based diesel over petroleum, not considering other renewable fuels, and that the agency failed to "meaningfully" consider the six factors. NBB Br. 9–10. Both arguments miss the mark.

NBB suggests that, because the statute "was intended to 'increase the production of clean renewable fuels' as a substitute for petroleum fuel," *id*. at 21 (quoting Pub. L. No. 110-140, preamble), the only relevant comparison is to petroleum, not to other categories of renewable fuel. But NBB identifies nothing in section 7545(*o*)(2)(B)(ii) or any other section that requires EPA to assess the performance of a particular renewable solely by reference to petroleum fuel. Its analysis would require us to read the term "renewable fuels" used throughout section 7545(*o*)(2)(B)(ii) to refer to the single renewable fuel being analyzed, even though the statutory definition of "renewable fuel" includes all types of renewables. *See* 42 U.S.C. § 7545(*o*)(1)(J). And if EPA could compare the benefits of each specific fuel only to petroleum, it might be unable to set rational applicable volumes for each specified category of renewable fuel after 2022, when the statute no longer sets any specific volumes. *See id.* § 7545(*o*)(2)(B)(iii)–(v). EPA could easily conclude, for example, that each renewable fuel had a lower "impact . . . on the environment" than petroleum fuel, *see id.* § 7545(*o*)(2)(B)(ii)(I), but, no matter their differing merits in serving the statute's goals, the agency would be barred from making relative judgments among renewable fuel categories.

NBB also argues that EPA failed to give meaningful consideration to the six statutory factors, and instead "pre-

determined the outcome," NBB Br. 20, but the record shows otherwise. EPA considered in detail how setting the biomass-based diesel applicable volume at a level higher or lower than 2.1 billion gallons would affect the six statutory factors. *See* 2017 Rule, 81 Fed. Reg. at 89,798–99. EPA further elaborated its analysis of the factors in an 11-page supplemental memorandum evaluating effects of its proposed biomass-based diesel volume on renewable fuel production rates, the environment, and the economy. *See* Supplemental Assessment 1–11, Coffeyville J.A. 524–34. EPA concluded that, over the long term, "[a] variety of different types of advanced biofuels, rather than a single type such as [biomass-based diesel], would positively impact energy security . . . and increase the likelihood of the development of lower cost advanced biofuels that meet the same [greenhouse gas] reduction threshold as [biomass-based diesel]." Supplemental Assessment 3, Coffeyville J.A. 526. EPA thus concluded that the statutory factors supported its biomass-based diesel applicable volume. *See* 2017 Rule, 81 Fed. Reg. at 89,798/3.

At bottom, NBB's objections rest on a policy disagreement: NBB urges that, instead of setting a level that would support continued investment in the biomass-based diesel industry while also encouraging producers of other types of advanced biofuel to compete to satisfy the 2018 advanced biofuel applicable volume at lower cost, EPA should have reserved to biomass-based diesel alone a volume nearer to that industry's maximum production potential. But NBB's proposed "simple solution"—that EPA should have "set[] a meaningful [biomass-based diesel] volume" while planning to "increas[e] the 2018 advanced-biofuel volume to provide room for the production of other advanced biofuels when it set that volume a year later," NBB Br. 23—describes what EPA actually did. A mere disagreement with the particular calibration of a line drawn in the exercise of an agency's

reasonable judgment is no basis to invalidate a rule. Therefore, we deny NBB's petition.

## VII.    Conclusion

For these reasons, the petitions for review are denied.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring in part and concurring in the judgment:

The Clean Air Act's Renewable Fuel Program operates on an annual cycle. It provides annual credits, authorizes annual waivers, and calls for annual reviews, see, e.g., 42 U.S.C. § 7545(o)(5), (7), (10)—all to implement Congress's annual goals, see *id*. § 7545(o)(2)(B).

Each year, as part of this annual affair, the Environmental Protection Agency embarks on an elaborate rulemaking. *Id*. § 7545(o)(3)(B). In doing so, it receives an annual estimate of the total volume of fuel to be sold to inform it in setting the annual "renewable fuel obligation," *id*. § 7545(o)(B)(i), which "shall . . . be applicable to refineries, blenders, and importers, as appropriate," *id*. § 7545(o)(3)(B)(ii)(I). So EPA is to specify appropriateness among those three categories. But "appropriate" as of when?

Coffeyville Petitioners say appropriate as of the annual rulemaking.

But EPA says appropriate as of the last time EPA happened to consider the issue, no matter how many years earlier that was. The initial determination sticks for "all years," EPA says, "unless and until" EPA chooses, in its "discretion," to "undertake [an] annual reevaluation[]." Denial of Petitions for Rulemaking to Change the RFS Point of Obligation, EPA-HQ-OAR-2016-0544-0525, at 7 (Mar. 13, 2018) ("EPA Denial"), J.A. 779; see also EPA Br. 66 (claiming "discretion" to decide "whether, how, and when" it will "reconsider its initial designation"). Even when affected parties point to a series of market "disparities" that they say have developed and render the earlier determination "not appropriate," and point to § 7545(o)(3)(B)(ii)(I) as entitling them to a fresh determination, see, e.g., Valero Energy Corporation

Comments, EPA-HQ-OAR-2016-0004-1746, at 1, 14 (July 11, 2016), J.A. 138, 151, EPA claims that that section does nothing of the sort, see EPA Denial at 8, J.A. 780 (asserting full "discretion" to decide "when" and "under what circumstances" it will consider the issue). In Part V.A of the court's opinion, my colleagues accept EPA's theory. I, however, disagree. So while I otherwise join the court's opinion in full, I cannot joint Part V.A—though I do, in the end, concur in the judgment.

\* \* \*

At the risk of oversimplifying, we can boil this annual process down to three steps.

*First, the annual goal.* Congress sets annual (steadily increasing) goals for the volume of *renewable* transportation fuel to be sold or introduced into commerce in the United States, with special targets for some subsets of renewable fuel. 42 U.S.C. § 7545(o)(2)(B)(i).

*Next, the annual estimate.* The Energy Information Administration projects the *total volume* of transportation fuel that will be sold into commerce in a given year (as well as volumes of biomass-based diesel and cellulosic biofuel). 42 U.S.C. § 7545(o)(3)(A); see, e.g., Letter from Adam Sieminski, Administrator, U.S. Energy Information Administration, to Gina McCarthy, Administrator, U.S. Environmental Protection Agency, EPA-HQ-OAR-2016-0004-3646 (Oct. 19, 2016), J.A. 494.

*Finally, the annual obligation.* This is set by EPA during the agency's annual rulemaking. And it is expressed in terms of a single percentage of transportation fuel sold into commerce (the "renewable fuel obligation") by any obligated party (regardless of category). 42 U.S.C. § 7545(o)(3)(B)(ii); see, e.g., Renewable Fuel Standard Program: Standards for 2017

and Biomass-Based Diesel Volume for 2018, 81 Fed. Reg. 89,746, 89,751/3 (Dec. 12, 2016) ("2017 Rule"). The basic idea is this: If EPA knows (i) the annual goal for the volume of *renewable* fuel introduced into commerce (see step one above), and (ii) the annual estimate for the *total* volume of fuel to be introduced into commerce (see step two above), then EPA— after filling in any gaps in the goals left by Congress, see 42 U.S.C. § 7545(o)(2)(B)(ii), and making any necessary adjustments to the estimates provided by the Energy Information Administration, see *id*. § 7545(o)(3)(A)—can set the minimum percentage of renewable fuel that must be introduced into commerce by "obligated parties." If everything works out well, Congress's annual goal should, more or less, be met.

But who are these "obligated parties"? Under the Act, EPA must tell us. The first among the three "Required elements" of the annual determination is that it "be applicable to refineries, blenders, and importers, *as appropriate*." 42 U.S.C. § 7545(o)(3)(B)(ii)(I) (emphasis added).

Even though EPA "determine[s] and publish[es]" the annual obligation anew "[e]ach [] calendar year[]," 42 U.S.C. § 7545(o)(3)(B)(i), since 2010 it hasn't considered what parties are "appropriate" to obligate. Regulation of Rules and Fuel Additives, 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010); see also Regulation of Fuels and Fuel Additives, 72 Fed. Reg. 23,900, 23,923/2 (May 1, 2007). Rather, year in and year out, the agency has simply "indicated," "in passing," that the renewable fuel obligation "would apply to '. . . producers and importers,'" "consistent with [its] preexisting" determination. EPA Br. 69–70 (quoting 2017 Rule, 81 Fed. Reg. at 89,746/2). That's it. In my view, however, the language of the statute requires more. EPA's contrary reading seems to me to go unreasonably "beyond the meaning that the statute can bear." *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 886 F.3d 1253,

1255 (D.C. Cir. 2018) (quoting *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994)).

* * *

The key provision says, "[n]ot later than November 30 of each [] calendar year[]," EPA "shall determine and publish in the Federal Register . . . the renewable fuel obligation." 42 U.S.C. § 7545(o)(3)(B)(i). The first of the "Required elements" of that annual obligation is that it shall "be applicable to refineries, blenders, and importers, as appropriate." *Id.* § 7545(o)(3)(B)(ii)(I).

This much tells us a few things. First, Congress required EPA to set the renewable fuel obligation annually. That feature of the requirement pretty clearly indicates a congressional expectation of possible year-to-year variation in all the mandatory elements—not merely in the percentage chosen (which is addressed in subclauses (II) and (III)). Second, one explicitly required element of this annual determination is a selection among "refineries, blenders and importers," a selection that must be "appropriate." Taken together, the Act seems inevitably to require EPA to apply (at least) some thought to the issue of what market sectors should be obligated—thought that the agency must apply each time it sets the annual obligation. After all, the term "appropriate" "naturally and traditionally includes *consideration* of all the relevant factors," not just a recitation that some time ago the agency considered the factors that it then thought relevant. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (emphasis added) (quoting *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part)). The agency, in other words, must "exercise its discretion to choose among the options" that Congress has given it, *Maj. op.* 45 (quoting *Kisor*

*v. Wilkie*, 139 S. Ct. 2400, 2449 (2019) (Kavanaugh, J., concurring in the judgment)), not "explain[]" why, in the agency's opinion, it's "appropriate" *not* to choose among the options that Congress has given it, *id.*; see Response to Comments, EPA-HQ-OAR-2016-0004-3753, at 542 (Dec. 12, 2016), J.A. 761 (declaring the point-of-obligation "issue" "beyond the scope of this rulemaking").

Suppose a law school charter—adopted at the school's founding in 1920—calls on the dean to annually set a "tort credits obligation," consisting of a minimum number of credit hours students must devote to certain tort subjects; the dean is to make the obligation "applicable to negligence, defamation, battery, and alienation of affections, as appropriate." The first dean, in 1921, sets the obligation at three credit hours per subject—and applies it to all the subjects. For the 2020–21 academic year, the tenth dean likewise duly requires students to devote at least three credits hours to those same subjects— including alienation of affections. Students understandably protest, since that tort is now a bygone relic. See *Fitch v. Valentine*, 2005-CA-01800-SCT (¶¶ 79–81) (Miss. 2007) (Dickinson, J., concurring), 959 So. 2d 1012, 1036 (noting 31 states have "completely abolished" it). But the dean adamantly refuses even to *consider* their entreaties, "explain[ing]" (*Maj. op.* 45) they're "beyond the scope" (J.A. 761) of topics relevant to the annual credit determination, which, after all, is perfectly "consistent with [a] preexisting" 1921 determination that that application was "appropriate" (EPA Br. 70). EPA's reasoning (on the procedural point—whether or not the phrase "applicable . . . as appropriate" requires it to consider the issue) is, in essence, as startling as the dean's. Never mind whether, as a substantive matter, studying the tort—or exempting blenders—is actually "appropriate." Cf. *Maj. op.* 52. EPA tells us it need not even *address* the point—ever again.

EPA's response does more to hurt than to help its cause. The agency points us to similarities between the provision we've been discussing, § 7545(o)(3)(B)(ii)(I), and § 7545(o)(2)(A)(iii)(I), which I'll call the "compliance provision." The two echo each other, see Oral Arg. Tr. 70:19–25, both using the "applicable . . . as appropriate" formulation.

*Annual determination*, 42 U.S.C. § 7545(o)(3)(B)(i), (ii)(I):

> [E]ach . . . calendar year[] . . . , the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register . . . the renewable fuel obligation . . . . The renewable fuel obligation . . . shall . . . be applicable to refineries, blenders, and importers, as appropriate.

*Compliance provision*, 42 U.S.C. § 7545(o)(2)(A)(i), (iii)(I):

> Not later than [August 8, 2006], the Administrator shall promulgate regulations . . . . [T]he regulations . . . shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate . . . .

As EPA reads the two, the agency may define the point of obligation *once*—while announcing the compliance provisions at the outset of the program. See EPA Br. 66. Congress's command to make the annual renewable fuel obligation "applicable . . as appropriate" is simply, in the agency's view, a cross-reference back to the "applicable . . . as appropriate" determination made by EPA at the outset in its adoption of compliance regulations. See, e.g., *id*. at 69–70; Oral Arg. Tr. 70:19–71:15, 72:13–24, 73:16–74:13.

The agency's reading, however, seems utterly implausible. When Congress uses "identical words" in "different parts of the same statute," we normally infer that those words carry "the same meaning." *Henson v. Santander Consumer USA Inc.*, 137

S. Ct. 1718, 1723 (2017) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)). So if "applicable . . . as appropriate," in the context of setting the compliance regulations, means (as everyone agrees it means) that EPA is to *contemporaneously* assess the appropriateness of its decision, then the same phrase, in the context of setting the annual renewable fuel obligation, must mean the same thing: EPA is to make a contemporaneous assessment of appropriateness—rather than, as the agency implausibly claims, treat a decision made long ago as dispositive for the present.

The majority responds—somewhat bafflingly—that nothing in the phrase "applicable . . . as appropriate" indicates "*when* or in what context EPA must make the appropriateness determination." *Maj. op.* 46 (emphasis added). But that can't be right. Imagine a daycare advertises that it will dress kids for recess, "as appropriate." Would any reasonable speaker of English really harbor any doubt as to whether there existed a "particular temporal" connection between the selection made and the selection's appropriateness? *Id*. at 45. Surely parents would be surprised to learn that the school's clothing selection for a snowy, December day was not "appropriate" in light of the then-pounding blizzard, but, rather, was "appropriate" in light of the sunshine from six months earlier, when the daycare first opened.

In fact, had Congress wanted EPA to readopt a prior determination, without any contemporaneous analysis as to appropriateness, "it could easily have chosen clearer language" to do just that. *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 939 (2017). Related provisions of the same statute provide examples of such straightforward wording. An obvious possibility would be to replace "applicable to refineries, blenders, and importers, as appropriate," with "applicable to Obligated Parties (as defined by the Administrator under 42 U.S.C. § 7545(o)(2))," thus using the pattern adopted in

§ 7545(h)(1), (k)(3)(B)(i). Another obvious way of expressing what EPA says Congress meant would have been to modify "refineries, blenders, and importers" with the phrase, "in conformity with the compliance provisions established by the Administrator," thus paralleling the approach of § 7545(b)(2). Both formulations, relying on a past participle, easily invite the construction that EPA prefers—allowing the administrator to rely on a decision made at some unspecified time in the past. "The fact that [Congress] did not adopt [any of these] readily available and apparent alternative[s] strongly supports rejecting [EPA's] reading." *Knight v. Commissioner*, 552 U.S. 181, 188 (2008).

Further, rather than using such easy alternatives, Congress chose language that, as read by EPA, makes a mess of virtually all of § 7545(o)(3)(B)(ii). Again, subclause (I) requires the "renewable fuel obligation" to "be applicable to refineries, blenders, and importers, as appropriate." 42 U.S.C. § 7545(o)(3)(B)(ii)(I). If Congress had envisioned EPA "identif[ying] the 'appropriate' obligated parties" in its exercise of the compliance provision (§ 7545(o)(2)(A)(iii)(I)), rather than of this clause, as EPA says it did, see EPA Br. 7, then subclause (I) would be doing no work at all—contrary to the "principle of statutory construction that we must 'give effect, if possible, to every clause and word of a statute,'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

EPA and the majority respond that subclause (I) is needed to "clarify[]" that distributors—who *can* be subjected to the compliance provisions—"*cannot* be" subjected to the renewable fuel obligation. Oral Arg. Tr. 75:9–12 (emphasis added); see also *Maj. op.* 47. Compare 42 U.S.C. § 7545(o)(2)(A)(iii)(I) (providing that the compliance provisions shall be "applicable to refineries, blenders, *distributors*, and importers, as appropriate" (emphasis added)),

with *id*. § 7545(o)(3)(B)(ii)(I) (providing that the renewable fuel obligation shall be "applicable to refineries, blenders, and importers, as appropriate"). But the need for clarity could be attributed to "most superfluous language." *SW General*, 137 S. Ct. at 941. And if clarity were actually Congress's goal, if all Congress wanted to do in subclause (I) was exclude "distributors" from the universe of potential obligated parties, *Maj. op.* 47, it chose an exceedingly odd way of getting there: inserting into an annual exercise the task of indicating what entities are "appropriate" targets for the renewable fuel obligation. Wouldn't it have been more straightforward to just reference EPA's prior determination, and then directly state— *for the purpose of clarity*—that the renewable fuel obligation may not apply to "distributors"?

In any case, it's hard to see what distributor-based obscurity EPA sees a need for subclause (I) to correct. Because the renewable fuel obligation concerns only fuel that is "sold or introduced *into* commerce in the United States," 42 U.S.C. § 7545(o)(2)(A)(i), (o)(3)(B)(ii)(II) (emphasis added), the obligation applies, for any gallon of fuel, only once—i.e., when the fuel enters the American economy upstream, not when distributors transport the same fuel downstream.

Once the sale or introduction "into" commerce is complete—once a given unit of fuel is already flowing through American commerce—that same unit of fuel cannot be sold or introduced "*into*" American commerce again; it's already there. While one, for example, might say that a fuel line, which carries fuel from a car's tank to its engine, carries fuel "*in*" the car, no one would say that it carries fuel "*into*" the car. So too, while one might say that a distributor, which transports fuel from the economy's refineries to its retailers, see 40 C.F.R. § 80.2(*l*); EPA Denial at 9, J.A. 781, transports fuel "*in*" the economy, no one would say that it transports (or sells or introduces) fuel "into" the economy; again, the fuel is already in the relevant

process. Congress itself recognizes the distinction, referring to fuel that is "sold or introduced *into* commerce," 42 U.S.C. § 7545(o)(2)(A)(i), (o)(3)(B)(ii)(II) (emphasis added), and fuel that is "sold or *distributed in* . . . commerce," *id*. § 7545(u)(4) (emphasis added). Because distributors do only the latter—they move fuel "in," not "into," commerce—there is nothing for subclause (I) to clarify. These downstream intermediaries can never fall within the universe of potentially obligated parties.

My colleagues don't claim to disagree; at most, they declare it "non-obvious" that "distributors cannot be subjected to the point of obligation." *Maj. op.* 47. But what's "non-obvious" about it, even if we put the plain meaning of "*into* commerce in the United States" aside? That phrase appears throughout the statute—and can't possibly include downstream, distributor transactions. Take the statutory provision concerning the Energy Information Administration, which says that the agency must provide EPA with an estimate of the "volume[] of transportation fuel . . . projected to be sold or introduced into commerce in the United States." 42 U.S.C. § 7545(o)(3)(A). Does Congress really expect that estimate—and the regulatory burdens "based on" that estimate, *id*. § 7545(o)(3)(B)(i), (o)(7)(D)(i)—to radically fluctuate based on the frequency of transactions among the distributors that happen to line the distribution network? So if every distributor starts selling to another distributor, or several of them, the calculated volume of fuel "sold or introduced into commerce in the United States" would balloon overnight? I doubt it.

EPA, it seems, shares my skepticism. The agency itself describes the renewable fuel obligation, not in terms of downstream intermediaries, like distributors, but in terms of the initial, upstream players—those "responsible for *introducing [fuel] into* the domestic gasoline pool." 72 Fed. Reg. at 23,904/1 (emphasis added). Indeed, when defining the

renewable fuel obligation, EPA speaks not of sales that happen to occur, distributor-to-distributor, along the supply chain, but only of initial injections into U.S. commerce as a consequence of the upstream "produc[tion]" or "import[ation]" of transportation fuel. 40 C.F.R. § 80.1407(a), (b).

What about blenders, asks the majority? Aren't they potentially obligated parties, even though they, like distributors, handle fuels that have already been "introduce[d]" into U.S. commerce by other upstream entities, like refineries? *Maj. op.* 46–47. Yes, of course, they are. But that's because blenders—unlike distributors—are the ones who *initially* sell or introduce various types of finished transportation fuel "*into* commerce in the United States." E15, for instance, a blend of 85% gasoline, 15% ethanol, generally enters "into" American commerce at the hands of a blender—the entity that actually blends the various components. Just ask EPA, which references the "ethanol blenders that introduce E15 into commerce." 76 Fed. Reg. 44,406, 44,410/3 (July 25, 2011). A distributor, in contrast—and by definition, whether that's a "post-enactment regulat[ory]" definition, *Maj. op.* 47, or a pre-enactment dictionary definition—never introduces anything "into" commerce. It only distributes (i.e., "transports" or "deliver[s]") finished transportation fuel, such as E15, from one point to another. See 40 C.F.R. § 80.2(*l*); *Webster's Third New International Dictionary* 660 (1961) (defining "distribute"). So subclause (I), as EPA reads it, is, in fact, a superfluity, because the agency could not place the point of obligation on distributors whether that clause existed or not.

The muddle generated by EPA's reading doesn't end there. Consider the effect on subclause (III). That provision provides that the "renewable fuel obligation . . . shall . . . consist of a single applicable percentage that applies to all categories of persons specified in subclause (I)." 42 U.S.C. § 7545(o)(3)(B)(ii)(III). But if EPA is right, and the point of

obligation is determined, not under subclause (I), but under the compliance provision, why does Congress take such a circuitous route to get there—a reference in subclause (III) to subclause (I), which, in turn, in EPA's reasoning (but without linguistic underpinning), refers back to the compliance provision? Couldn't Congress in subclause (III) have just alluded to decisions made by EPA under the compliance provision directly? Cf., e.g., 42 U.S.C. § 7545(o)(4)(A). EPA doesn't say.

Instead, the agency puts essentially all its eggs in the compliance provision basket. EPA argues, first and foremost, that its power to promulgate compliance provisions is broad and includes the power to set the point of obligation. And "nothing," it says, requires it to "reconsider" that determination. See, e.g., EPA Br. 67–68. My colleagues offer a similar thought, claiming that Congress knew how to call for a "redo" if that is what it really wanted. *Maj. op.* 48. Both arguments, however, miss the point. When Congress mandates an annual "determin[ation]" in 42 § 7545(o)(3)(B)(ii), there is nothing to be redone or reviewed. The determination must happen anew each year, and the specific instruction to apply that determination "to refineries, blenders, and importers, as appropriate," controls, *id*. § 7545(o)(3)(B)(ii)(I); any general authorization to promulgate compliance provisions (including, I'll assume, license to not "reconsider" them) must yield to that specific instruction. See *SW General*, 137 S. Ct. at 941 ("[I]t is a commonplace of statutory construction that the specific governs the general." (alteration in original) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

"[B]asic principles of administrative law," unfortunately for the majority, only further erode EPA's position. *Maj. op.* 52. We "generally 'presume[] that Congress expects it statutes to be read in conformity with the[] [Supreme] Court's

precedents.'" *Porter v. Nussle*, 534 U.S. 516, 528 (2002) (second alteration in original) (quoting *United States v. Wells*, 519 U.S. 482, 495 (1997)). And those precedents make clear that an agency, when exercising its congressionally delegated authority, must "consider [every] important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983). Failure to do so "would be arbitrary and capricious." *Id*. With that background in mind, it "would be strange indeed" if Congress really expected EPA, year in and year out, to set the renewable fuel standards for the entire economy, yet allowed the agency—*sub silentio*—to do so without considering ever again whether a "foundational" element of the regulatory program was "appropriate." *Maj. op.* 49.

Retreating from the statutory language, EPA claims that reading the Act to require it to appropriately identify the point of obligation each year would be inconsistent with Congress's "purpose." Specifically, the agency says, it would "reduce the regulatory certainty required for private parties to plan for growth." EPA Br. 72. But EPA's fears are vastly overblown. Its concern about upsetting investment-backed expectations is a reason to *not change* the point of obligation; it is not a reason to *not consider* doing so. The same goes for my colleagues' concerns about the credit trading program, see *Maj. op.* 50, even if that program really does require (as my colleagues seem to assume it does) rock solid stability in the point of obligation—a dubious proposition, given that credits are held individual-entity-by-individual-entity, so that shrinkage or swelling of the number of covered entities has no impact on the needed computations. EPA's duty is to "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43—an explanation that must consider the industry's (including the credit traders') reliance on a prior determination, see, e.g., *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that it "would be arbitrary and

capricious to ignore" the fact that a "prior policy has engendered serious reliance interests"); *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) (similar). In fact, given the substantial reliance interests at stake, along with the agency's prior findings, it seems likely that (in the absence of significantly changed circumstances or a compelling new analysis) EPA would be able to make rather short work of the annual analysis. In most years, the prior analyses and the reliance interests would probably dictate the conclusion.

In any event, especially when the alleged downside of petitioners' claim is so chimerical, our "role is not to 'correct' the [statutory] text so that it better serves [Congress's] purposes." *Va. Dep't of Medical Assistance Servs. v. U.S. Dep't of Health & Human Servs.*, 678 F.3d 918, 926 (D.C. Cir. 2012) (some internal quotation marks omitted) (quoting *Engine Manufacturers Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)). That is a job for Congress.

For these reasons, I respectfully disagree with the panel's conclusion, which grants EPA essentially unfettered discretion as to when—or even *if*—it will consider the appropriateness of the point of obligation.

Indeed, the panel, it seems to me, arrived at its conclusion only by extending to EPA the type of "reflexive" deference that the Supreme Court has recently criticized. *Kisor*, 139 S. Ct. at 2415 (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring)). The Court has made clear that before we may declare a statute genuinely ambiguous—and, thus, before we, an Article III court, may surrender to an executive agency's (often self-serving) declaration of what the law means—we must exhaust all the "traditional tools" of statutory construction. *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837, 843 n.9 (1984)). Then and only then—"when that legal toolkit is empty"—may we "wave the ambiguity flag." *Id.*

The majority, however, in apparent haste to bow to EPA's admittedly self-serving declaration of what the law means, see *Maj. op.* 51 (describing the "burden[s]" that EPA would rather avoid), doesn't *actually use* any of the tools of statutory construction in an attempt to discern Congress's meaning. For example, besides acknowledging that EPA's reading of the phrase "applicable . . . as appropriate" "is not ineluctable," *Maj. op.* 48, the majority has almost nothing to say about that phrase's ordinary meaning. Although the majority declares it "ambiguous," *id.* at 49, my colleagues do not offer a single example of the phrase being used in the way EPA desires—where the duty to make a selection, "as appropriate," (somehow) permits the decisionmaker wholly to ignore the contemporaneous context of his selection. But see *supra* pp. 5, 7 (offering examples where EPA's interpretation makes no sense). The majority's treatment of the presumption of consistent usage isn't much better. It says that there are multiple "permissible" ways to ascribe the same meaning to the same words, but doesn't offer any, see *Maj. op.* 46—all the while overlooking an obvious interpretation that satisfies the presumption (i.e., EPA must consider the factors that are relevant at the time of its decision), see *supra* pp. 6–7. Finally, the majority writes off the canon against surplusage without actually finding that the language at issue isn't superfluous. The majority avers that a finding of superfluity "rests on a complicated series of inferences," *Maj. op.* 47, but that's not unusual, or reason to shy away from wading through the muddle. Complex regulatory schemes "can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved." *Kisor*, 139 S. Ct. at 2415. To solve such conundrums, however, we must embrace the canons of interpretation as the useful tools that

they are for discerning Congress's meaning, not as pests to be dodged and swatted away in our rush to deference. Here, when those tools are properly applied, we can discern Congress's meaning—which "is the law and must be given effect." *Chevron*, 467 U.S. at 843 n.9.

Nonetheless, I concur in the judgment. As we explain today with regard to claims brought by the Alon Petitioners, EPA adequately explained, at around the time it set the annual obligation for 2017, why it was not "appropriate" (in light of the facts as they then existed) to change the point of obligation. See *Maj. op.*, Part IV.B. Although that explanation arose in the context of a petition for rulemaking—and was thus subject to a more deferential form of arbitrary and capricious review—I would hold here (for the same reasons that we give in Part IV.B of the majority opinion) that EPA's reasoning was sufficient even under the deference level that demands more of the agency.

The difference in our standard of review between an appeal from the agency's annual determination under § 7545(o)(3)(B)(i), (ii)(I), on the one hand, and an agency's conventional duty to entertain a petition for a rulemaking to revise an existing regulation, on the other, is in practice fairly slight. Under both understandings, the agency is bound to give suitable weight to reliance interests, and indeed to the general advantage of regulators' not rocking too many boats. A party challenging the status quo faces some sort of burden in either context—to point to new facts, or to new discoveries of facts, or to previously unnoticed flaws in the agency's analysis, etc. There is, to be sure, a subtle difference in the deference level, but deference levels themselves build in a good deal of subjectivity. I nonetheless write separately because I see Congress as having imposed a specific, if modest, duty, on the agency, and having thereby provided an explicit avenue for review. That explicitness seems to me designed to, and likely

to, concentrate the mind of the administrator—a congressional choice that we should honor.